Opinión disidente emitida por la
Juez Asociada Señora Ro-dríguez Rodríguez.
“la certidumbre:
excelente!
la confianza:
bella!
pero sin justicia ambas me causa-rían terrible tormento”(1)
La certeza de la ley no puede ser enemiga de la justica. Este Tribunal hoy tiene ante sí un llamado a superar, den-tro de sus contornos constitucionales, una lectura anquilo-sada que abre brecha entre el régimen jurídico y la realidad. Según veremos a continuación, el dictamen de la mayoría del Tribunal se inserta en atavismos sociales y morales, produciendo un resultado antijurídico, inconstitu-cional, absurdo, injusto y equivocado. Con tal proceder, la mayoría de este Foro se resiste a reconocer el palimpsesto significativo que exige el lenguaje de nuestro texto legal y que es afín al desarrollo de una sociedad puertorriqueña plural y heterogénea.(2)
*1002 Ante nuestra consideración se encuentra una controver-sia que encarna principios básicos de dignidad humana y de igualdad ante la ley. La interrogante que se nos planteó trata sobre si una persona del mismo sexo de la madre de una menor la puede adoptar sin que ello suponga la extin-ción de los vínculos de parentesco existentes entre esa ma-dre y su hija. Sostengo que la respuesta es que sí. Hoy, sin embargo, este Tribunal, aferrado sotto voce a atavismos de un pasado por mucho superado, se niega a reconocer la realidad extrajudicial existente entre JMAV y “mamá”, im-partiéndole valor jurídico a su innegable relación de madre e hija.
La venda que adorna la majestuosa figura de la Justicia se debe utilizar para dispensarla con imparcialidad y sen-sibilidad, no para impedir —porque no se vislumbra el ver-dadero alcance de nuestras prerrogativas constituciona-les— que quien, en efecto, es madre pueda adoptar a la hija de su compañera de vida, la cual vio nacer y ha criado desde entonces junto a ella. Ahí yace el mejor interés y bienestar de la menor. Es trágico para un país que su más Alto Foro tenga sobre sí una visión de tan corta mira.(3)
*1003 Se trata de resolver si nuestro estatuto sobre adopción permite, no obstante el texto del Art. 138 del Código Civil,(4) que atendiendo al mejor interés y bienestar de la persona adoptada, se incorpore a nuestra jurisdicción la figura de la adopción por parte del segundo padre o se-gunda madre funcional.(5) Ya que el Tribunal rechaza esa posibilidad, debemos pasar juicio sobre la constitucionali-dad del Art. 138 del Código Civil.
A diferencia de la mayoría del Tribunal, somos del cri-terio de que nuestro estatuto de adopción permite incorpo-rar la figura según lo solicita la peticionaria. De igual ma-nera, y por las razones que pasaremos a discutir, diferimos del criterio de la mayoría al considerar que el Art. 138 está viciado de inconstitucionalidad.
*1004 I
El 7 de junio de 2005, la peticionaria AAR presentó una petición de adopción de la menor JMAV, hija biológica de CW, quien ha sido su compañera consensual durante los últimos veinte años.(6) El nacimiento de JMAV fue el resul-tado de un procedimiento de inseminación artificial al cual se sometió CW Ello, luego de que ella y AAR se propusie-ran como objetivo común la maternidad. Así las cosas, la peticionaria solicitó que JMAV fuera inscrita como su hija en el Registro Demográfico sin que se rompiera el vínculo jurídico con su madre biológica. La madre biológica de la menor suscribió una declaración jurada en la cual consen-tía a la adopción pero expresaba que no renunciaba a sus derechos ni al vínculo de filiación con su hija. Esta decla-ración jurada acompañó la petición de adopción.
La declaración jurada obedece a que de acuerdo con lo dispuesto en el Art. 138 del Código Civil, sólo cuando “el adoptado proviene de una única filiación y es adoptado por persona de distinto sexo al del padre o madre que lo ha reconocido como su hijo”, es que subsisten los lazos fami-liares; con lo cual, si quien adopta es del mismo sexo de la madre biológica, ésta pierde su condición jurídica de madre.
En el memorando de derecho presentado coetáneamente a la solicitud de adopción se adujo que la figura de la adop-ción por el segundo padre o madre funcional hacía viable la *1005 adopción en este caso sin afectar los derechos parentales de la madre biológica. (7) Se solicitó que se adoptara esta doctrina, dándole curso a la adopción solicitada, pues de esta forma se adelantaban y garantizaban los mejores in-tereses de la menor.
Una vez se presentó la petición, la Procuradora de Re-laciones de Familia presentó un extenso escrito donde, con rigor y seriedad, argüyó que no procedía acceder a la peti-ción de AAR. La procuradora evaluó la solicitud desde la perspectiva estatutaria y constitucional para concluir que ni la ley vigente ni el texto constitucional viabilizaban la adopción solicitada. El Departamento de la Familia tam-bién se expresó sobre la petición de adopción.
El 8 de marzo de 2007 se celebró una vista evidenciaría ante el Tribunal de Primera Instancia y se sometieron va-rios informes periciales. El informe psicométrico de la me-nor JMAV reveló que ésta goza de excelente salud física y emocional, y tiene un desarrollo intelectual “muy superior cuando se compara con su grupo normativo”. Apéndice de la Petición de certiorari, pág. 173.
Por otro lado, el informe social sobre la peticionaria y su entorno familiar concluyó que: “[la] niña vive en una fami-lia donde sus necesidades tanto físicas como emocionales están siendo satisfechas y donde se propicia un ambiente proactivo y afectivo. En otras palabras, es un hogar seguro para JMAV donde no existe evidencia alguna de factores que puedan ser perjudiciales o pongan en riesgo el bienes-tar de la niña”. Apéndice de la Petición de certiorari, pág. 249. Sobre la peticionaria se indicó que “posee capacidades protectoras que permiten que la niña se desenvuelva en un ambiente donde se procura su mejor bienestar. [Se] eviden- *1006 cia la existencia de unos lazos afectivos fuertes entre [la peticionaria] y la niña...”. Íd., pág. 250.
El extenso informe de evaluación psicosocial preparado por la Dra. Carol Romey concluyó como sigue: “el núcleo familiar ... cumple con las expectativas clínicas del están-dar del bienestar de la niña. Tanto las necesidades emocio-nales y físicas está[n] cubiertas por [AAR y CW]. Ellas velan por la seguridad de la familia completa y la de [JMAV]. [AAR y CW] ha[n] tomado medidas excepcionales en la preparación, diálogo y supervisión de la crianza de [JMAV]”. Apéndice de la Petición de certiorari, pág. 203. La doctora Romey aseveró categóricamente que “[AAR] está preparada tanto emocionalmente como espiritualmente para asumir el rol de madre adoptiva de [JMAV]. Los ha-llazgos de este proceso evaluativo sostienen los múltiples esfuerzos, compromisos y sacrificio que [AAR] ha hecho en el nombre del bienestar de su núcleo familiar y de [JMAV], en particular”. Id., pág. 204. Todo ello para concluir, “sin reserva alguna, que [AAR] está preparad [a] para ser la ma-dre adoptiva de [JMAV]”. (Énfasis en el original). íd. Sobre la menor, la doctora Romey señala que ésta “posee la capa-cidad intelectual, emocional y social para entender la na-turaleza de este proceso de adopción [y] está totalmente preparada psicológica y socialmente para ser adoptada por [AAR]”. íd.
Sometido el caso para resolución, el foro de instancia emitió su dictamen en el que denegó la adopción solicitada. El Tribunal concluyó que el Código Civil prohíbe conceder la adopción según peticionada. Señaló que, de concederse la adopción, procedería extinguir, obligatoriamente, todo vínculo jurídico de la niña con su madre biológica, a lo que ésta última se había opuesto. Por último, el Tribunal de Primera Instancia señaló que la representación legal de la peticionaria no estableció que estaba impugnando la cons-titucionalidad de la Ley de Adopción y del Art. 138 del Có- *1007 digo Civil, por lo que el Tribunal no consideraría ese planteamiento.(8)
Inconforme, la peticionaria acudió ante el Tribunal de Apelaciones. Este foro confirmó el dictamen apelado. El foro apelativo resolvió que la figura de la adopción por el segundo padre o madre funcional “se aleja de los valores intrínsecos de nuestro pueblo y de la norma jurídica” que este Tribunal ha trazado en el pasado. Apéndice de la Pe-tición de certiorari, pág. 22. A manera de ejemplo para esta última proposición, el foro apelativo intermedio invocó, erróneamente, Delgado, Ex parte, 165 D.P.R. 170 (2005). El Tribunal de Apelaciones indicó que en ese caso resolvimos que no procedía anotar el cambio de sexo de la allí peticio-naria en su certificado de nacimiento porque ello podía re-sultar en la “concesión de adopciones de menores de edad [a] parejas adoptantes del mismo sexo, [lo cual] opera en contra de los valores y las normas jurídicas vigentes en nuestra jurisdicción”. (Enfasis nuestro y citas omitidas). Id., pág. 200. No es correcto que el texto citado formara parte de la Opinión del Tribunal en Delgado, Ex parte, pues tal expresión fue hecha por el Juez Asociado Señor Rivera Pérez en su Opinión de conformidad.(9) Por consi- *1008 guíente, la aseveración del tribunal intermedio en la con-troversia de autos es totalmente errada e induce a error.
El foro apelativo concluyó, entonces, que estaba “impedidlo] de aplicar la figura del Second Parent Adoption al presente caso, puesto que estaríamos actuando en contra de los valores reconocido [s] por la sociedad puerto-rriqueña y los postulados legales antes discutidos. Actuar en contrario implicaría estar legislando a través de doctri-nas del derecho común sobre un asunto cuya regulación le compete única y exclusivamente a la Asamblea Legis-lativa”. Apéndice de la Petición de certiorari, pág. 22.
Inconforme con este dictamen, la peticionaria acudió ante este Tribunal. Nos solicita que la autoricemos a adop-tar a quien es su hija, sin que la madre biológica pierda sus lazos de filiación y nos invita a que adoptemos en nuestra jurisdicción la figura de la adopción por el segundo padre o madre funcional para así hacer viable su reclamo pues, de lo contrario, deberíamos plantearnos si el Art. 138 del Có-digo Civil sufre de inconstitucionalidad.
Expedimos el auto solicitado. Con el beneficio de los ale-gatos de las partes y los alegatos de los amigos de la corte: la Unión Americana de Libertades Civiles (ACLU) yACLU Lesbian, Gay, Bisexual, Transgender and AIDS Project, el National Center for Lesbian Rights (NCLR), en unión a la *1009 ACLU, la Clínica de Sexualidad y Género de la Universi-dad de Columbia, la Academia Americana de Pediatría y el Departamento de Pediatría de la Escuela de Medicina de la Universidad de Puerto Rico, la Asociación de Psicología de Puerto Rico, el Colegio de Abogados de Puerto Rico, el Centro de Paz y Justicia de Las Américas, la Coalición Ciu-dadana en Defensa de la Familia y la Alianza de Juristas Cristianos, el Tribunal resolvió. En el dictamen que hoy se emite, este Tribunal confirma al Tribunal de Apelaciones.
Por no estar de acuerdo con la mayoría del Tribunal, disiento.
II
Antes de pasar de lleno a la discusión de la institución de la adopción y la figura de la adopción por el segundo padre o madre funcional, así como los planteamientos de índole constitucional, nos parece conveniente sentar algu-nos conceptos previos, sin los cuales no es posible una ade-cuada discusión del tema que nos ocupa.
La familia es un modo de organización social que se constituye en cada momento histórico en función de distin-tas creencias, tradiciones y modelos de comportamiento existentes.(10) La profesora Elisabeth Roudinesco, plantea *1010 que “[se] le atribuye al Estado democrático moderno, here-dero de [las] instituciones [judeocristianas], el deber de im-poner a sus miembros un orden simbólico cuya función con-sistiría en salvaguardar las referencias diferenciadas del hombre y la mujer. Desde este punto de vista, el padre y la madre son las imágenes fundadoras de la sociedad —y por lo tanto, de la familia— instituidas por el [D]erecho”. E. Roudinesco, La familia en desorden, 2da ed., México D.F., Fondo de Cultura Económica, 2006, pág. 209 (citando a Pierre Legendre, Llnestimable objet de la transmission. Étude sur les princies généalogiques en Occident (1985)). Sin duda, este modelo heterosexual de familia basado en la división de roles por géneros es el que se ha recogido en la mayor parte de los ordenamientos jurídicos.
Sin embargo, “[e]ste modelo se ve continuamente cues-tionado por la aparición de otros, basados en una concep-ción solidaria e intersectorial que supera ampliamente la concepción de la familia basada en el matrimonio y el parentesco”. S. Navas Navarro, Matrimonio homosexual y adopción, Madrid, Ed. Reus, 2006, pág. 203. La magis-trada Roca Trías plantea que no existe ya la “familia”, sino “las familias”, las cuales se constituyen de acuerdo con dis-tintos modelos de convivencia. E. Roca Trías, Familia, familias y derecho de la familia, XLIII (Fascículo IV) A.D.C. 1055, 1065 (1990). Esta situación, “ante la que no cabe cerrar los ojos, porque es una realidad”, pone de relieve que la construcción de la familia es, ante todo, de naturaleza cultural y “no... un producto natural,... y que las diversas culturas... llevan a la creación de un modelo no uniforme, de forma que en una sociedad concreta, en un momento histórico concreto, están presentes diversos tipos de fami-lias y esto es una verdad incontestable”. Id. Lo que no *1011 quiere decir, desde luego, que estos distintos modelos no puedan compartir rasgos similares o constantes.(11)
Como resultado de esta evolución, Judith Bulter se pre-gunta: “Is kinship always already heterosexual?”; a lo cual contesta: “there are various sociological ways of showing that in the United States a number of kinship relations exist and persist that do not conform to the nuclear family model and that draw on biological and nonbiological relations, exceeding the reach of current juridical conceptions, functioning according to nonformalizable rules”. J. Butler, Is Kinship Always Already Heterosexual? en Left Legalism/ Left Critique, W. Brown y J. Halley, eds., Durham y Londres, Duke University Press, 2002, pág. 229.
Actualmente, aceptamos la existencia de varios tipos de familias. A modo de ejemplo podemos enumerar las si-guientes: la familias monoparentales, producto de técnicas de reproducción asistida; aquellas en las que existen vín-culos biológicos respecto de uno de sus miembros y no res-pecto del otro, lo que ocurre en instancias de reconocimien-tos de complacencia; familias en las que el menor convive sólo con su madre o con su padre; las llamadas familias reconstruidas, “en las que el menor puede pasar a convivir con un progenitor y su pareja o cónyuge”, lo que se observa, por ejemplo, en ocasión de la custodia compartida, y las familias en las que el menor, fruto de la unión de un hombre y una mujer “(unidos previamente y posteriormente separados, divorciados o muerto uno de los dos) conviva con su progenitor o progenitora biológica y otra persona del mismo sexo de aquél”. M.D. Bardají Gálvez, La orientación *1012 sexual como factor determinante de la idoneidad para adoptar, 2008 Rev. Der. Priv. 55, 82 (mayo-junio 2008). Véanse, además: De Amunátegui Rodríguez, supra, págs. 45-51; S. Díaz Alabart, El pseudo “estatus familiae” en el Código Civil. Una nueva relación familiar, 76 Rev. Der. Priv. 839 (octubre 1992); K.D. Richman, Courting Change: Queer Parents, Judges, and the Transformation of American Family Law, Nueva York y Londres, New York University Press, 2010, pág. 21.
Es por ello que circunscribir la categoría familia a aque-lla unión marital entre un hombre y una mujer con fines reproductivos exclusivamente resulta hoy en día anacrónico.(12) Ignorar que el ámbito jurídico debe cristali-zar los arreglos sociales existentes redundaría en impartir una Justicia a medias. No podemos negar lo que ocurre a nuestro alrededor, no existe una única y monolítica familia. A diferencia de ello, conviven múltiples arreglos que se traducen en la configuración de relaciones familia-res basadas en el amor, la contención, la manutención y el cuidado común, y que no necesariamente se configuran al-rededor de una pareja o matrimonio heterosexual. En este sentido, los tribunales no podemos aferrarnos a una reali-dad que dejó de ser tal. Se ha dicho que “[e]l más largo aprendizaje de todas las artes es aprender a ver”.(13) No debemos negarnos a aprender, aprisionados en una visión que sólo reconoce un modelo único de familia merecedor de *1013 protección jurídica. Véanse: R. Carrasquillo Hedges, The Forgotten Children: Same-Sex Partners, Their Children and Unequal Treatment, 41 (Núm. 4) B.C. L. Rev. 883 (2000); A.R. Croteau, Comentario, Voices in the Dark: Second Parent Adoptions when the Law is Silent, 50 Loy. L. Rev. 675 (2004).
La evolución del concepto familia, o si se quiere, fami-lias, hasta el punto de admitir las más variadas formas de convivencia, repercute, necesariamente, sobre la adopción por la identificación de un concepto con el otro.(14)
Con estas reflexiones, procede que valoremos ahora la controversia planteada. Por su complejidad y la extensión de la ponencia, explico el orden seguido.
Abordaremos primero la institución de la adopción en nuestra jurisdicción y, desde luego, el concepto de mejor interés y bienestar del menor; pasaremos, entonces, a con-siderar la figura de la adopción por el segundo padre o madre funcional. Previo a evaluar los planteamientos cons-titucionales esgrimidos por la peticionaria respecto al dis-crimen por género y por orientación sexual, reflexionare-mos sobre cómo, mediante el ejercicio de nuestro minis-terio, los jueces actuamos como garantes del valor que pos-tula que los tribunales constituyen un foro propicio para la protección de los derechos humanos, donde prevalece el principio de igualdad entre las personas y la dignidad in *1014 violable del ser humano, pilares fundacionales de nuestra Constitución. A renglón seguido discutiremos el alcance de nuestra disposición constitucional sobre la igualdad ante la ley y la inviolabilidad de la dignidad humana, y cómo los asuntos mencionados ubican en este contexto. Finalmente, concluyo con lo que considero es el resultado no tan sólo justo, sino correcto en Derecho.
III
A
La adopción es la figura legal mediante la cual se busca instaurar entre dos personas una relación jurídica de filia-ción; es decir, vínculos jurídicos similares a los existentes entre una persona y sus descendientes biológicos. Feliciano Suárez, Ex parte, 117 D.P.R. 402, 406-408 (1986). Don Eduardo Vázquez Bote señala que
[p]uede definirse la adopción como el negocio jurídico familiar por el cual se establece entre dos personas una relación perfecta de filiación legítima.
Son características de la institución, las siguientes:
a) Es un acto de carácter irrevocable. Ciertamente, la nueva redacción del Código [C]ivil vigente, nada concreta al respecto; pero tal carácter deriva indudablemente por refe-rirse al estado civil de las personas.
b) Es un acto formalmente determinado, sujeto en su con-tenido a una tipificación legal rigurosa.
c) Es un acto que opera como eficacia peculiar el acceso a la patria potestad, o de modificar completamente la antes exis-tente, con efectos absolutos, al romperse el vínculo del adoptado con la familia anterior (art. 133, C.c.). E. Vázquez Bote, Ira ed., Tratado teórico, práctico y crítico de derecho privado puertorriqueño, San Juan, Butterworth de Puerto Rico, T. XI, 1993, pág. 343. Véanse, además: J. Castán Tobeñas, Derecho Civil español, común y foral, 10ma ed., Madrid, Ed. Reus, 1995, T. 5, Vol. 2, pág. 361; M. Albadalejo, Curso de Derecho Civil, 2da ed., Barcelona, Librería Bosch, Vol. IV, 2002, pág. 255; R.M. Moreno Flórez, Acto constitutivo de la adopción, Madrid, Ed. Colex, 1985.
*1015 Además, es un acto jurídico solemne y altamente regla-mentado que supone la ruptura del vínculo jurídico-fami-liar con la parentela natural e instaura una nueva filiación con la familia adoptante. López v. E.L.A., 165 D.P.R. 280 (2005). Producto de esa nueva filiación se le reconocen a la persona adoptada todos los derechos y todas las obligacio-nes del hijo biológico, a todos los efectos legales, sin limi-tación alguna. Feliciano Suárez, Ex parte, supra.
En nuestro ordenamiento, la institución de la adopción está regulada, en cuanto a lo sustantivo, por el Código Civil. Este cuerpo normativo establece los requisitos para adoptar y ser adoptado, el número de adoptantes, las per-sonas que deben consentir la adopción, y los efectos y las consecuencias que un decreto final y firme de adopción tiene sobre el adoptado y el adoptante. Véase 31 L.P.R.A. secs. 531-539. Por otra parte, el aspecto procesal de la adopción se rige por el Código de Enjuiciamiento Civil, 32 L.P.R.A. secs. 2699-2699t. Una vez cumplidos los requisi-tos sustantivos, son las disposiciones del Código de Enjui-ciamiento Civil las que delinean los pasos a seguir para conseguir la autorización judicial de una adopción. M.J.C.A., menor v. J.L.E.M., menor, 124 D.P.R. 910, 921 (1989). La política pública y judicial que ha prevalecido en nuestra jurisdicción es que el criterio rector que gobernará el proceso será el mejor interés y bienestar del menor. Ex parte J.A.A., 104 D.P.R. 551, 559 (1976).
Inicialmente, esta figura se incorporó a nuestro ordena-miento con la extensión del Código Civil español en 1889. Sin embargo, al ocurrir el cambio de soberanía se modificó el Código Civil y se importó la figura de la adopción de Luisiana, según establecida en su Código Civil. Véanse: Rivera Coll v. Tribunal Superior, 103 D.P.R. 325, 328 (1975); Art. 214 del Código Civil de Luisiana (1870).(15) Así, *1016 el Código Civil de 1902 disponía que “[cjualquiera persona puede adoptar [a] otra por hijo suyo”. Art. 200 del Código Civil de Puerto Rico de 1902. Por otra parte, el Art. 207 establecía que “[e]l adoptado conservará los derechos que le correspondan en su familia natural, [a] excepción de los relativos [a] la patria potestad”. Con la promulgación del Código Civil de 1930, la figura de la adopción no sufrió cambios sustantivos y su texto permaneció inalterado.
Como vemos, la ruptura del vínculo biológico entre el adoptado y su parentela natural no era obligatoria de acuerdo con las disposiciones del Código Civil de 1902 ni las de 1930, como tampoco lo fue, dicho sea de paso, según el Código Civil español de 1889. Compárense los Arts. 200-211 del Código Civil de Puerto Rico de 1902, los Arts. 130-141 del Código Civil de Puerto Rico de 1930, y los Arts. 173 — 180 del Código Civil español de 1889.
En 1953, la Asamblea Legislativa consideró necesario reformar integralmente la institución de adopción y atem-perarla a las corrientes modernas. Del Diario de Sesiones se deduce que la intención legislativa no era otra que pro-mulgar legislación de avanzada, dirigida a proteger a los menores sin consideración ulterior que no fuera su mejor interés y bienestar. Véase 2 (II) Diario de Sesiones de la Asamblea Legislativa 1291 (1953).(16)
En aquel entonces, el presidente de la Comisión de lo Jurídico, Hon. Santiago Polanco Abreu, afirmaba que “[l]a adopción no es un acto de caridad hacia los hijos menos afortunados. La Comisión entiende que la adopción es una institución de carácter esencialmente social que debe me- *1017 jorarse en nuestros estatutos”. Diario de Sesiones de la Asamblea Legislativa, supra, pág. 1292. En esa ocasión, la Asamblea Legislativa debatió si se debía o no romper el vínculo del adoptado con su familia biológica. Así, el de-creto de terminación definitiva de los lazos jurídicos entre la persona adoptada y su familia biológica fue objeto de un extenso y prolongado debate. La preocupación principal era que el padre o la madre biológicos intervinieran con la persona adoptada y dificultaran su adaptación a la nueva familia, lo que era contrario al mejor interés del menor. íd., págs. 1291 y 1330-1342. Finalmente, al aprobarse la Ley Núm. 86 de 15 de junio de 1953, el Art. 137 del Código Civil de 1930, que disponía que “[e]l adoptado conservará los derechos que le correspondan a su familia natural, a excep-ción de los relativos a la patria potestad”, desapareció al enumerarse nuevamente los artículos.(17)
Es fundamental aclarar que, si bien al final prevaleció la postura a favor del rompimiento del vínculo entre la persona adoptada y su parentela biológica, ello se debió al evidente deseo de facilitar la adaptación de ésta a la fami-lia adoptiva. Véase Historial Legislativo de la Ley Núm. 86 de 15 de junio de 1953. El legislador consideró que mante-ner una relación con la familia biológica podía entorpecer el desarrollo del adoptado en el nuevo seno familiar, por lo que consideró más apropiado el rompimiento de los víncu-los existentes con sus parientes naturales.
Así, no fue hasta el 1995 —cuarenta y dos años des-pués— que la Asamblea Legislativa entendió que era tiempo de templar las disposiciones que regulaban la adopción. De esta manera, nuevamente se dispuso a discu-tir y aprobar legislación a nivel sustantivo y procesal. La Ley Núm. 8 de 19 de enero de 1995 enmendó el aspecto sustantivo y la Ley Núm. 9 de la misma fecha enmendó el *1018 aspecto procesal. 31 L.P.R.A. secs. 531 — 539 y 32 L.P.R.A. secs. 2699-2699t, respectivamente.
En esta ocasión se discutió, nuevamente, si procedía o no desvincular al adoptado de su familia biológica. Inicial-mente, la Asamblea Legislativa entendió que era facultad del Tribunal decretar la subsistencia del vínculo jurídico de la persona adoptada con su familia anterior si eso respon-día a su mejor interés y bienestar. Véase Historial Legisla-tivo de la Ley Núm. 8, supra, Proyecto del Senado 944 de 16 de noviembre de 1994, art. 140, pág. 10. De igual ma-nera, la Comisión de lo Jurídico Civil de la Cámara de Representantes, por voz de su presidente, Hon. Leónides Díaz Urbina, sostuvo en su informe de 1 de diciembre de 1994, que “[e]l principio rector y la finalidad de dicha ins-titución, es el beneficio del adoptado; lo que debe predomi-nar frente a las ventajas que pueda ofrecer al adoptante”. Id. Asimismo, la Presidenta de la Cámara, Hon. Zaida Her-nández Torres, igualmente reconoció durante la Sesión de 8 de diciembre de 1994 que era de vital importancia que los niños y las niñas crecieran en “un hogar espiritual de una pareja que los ame, que los considere, que los eduque, que los cuide, que los atienda”. Diario de Sesiones de la Asam-blea Legislativa de 8 de diciembre de 1994. Igualmente, se dispuso que siempre deberá “proteger el bienestar y la sa-lud física, mental y emocional del menor y toda duda debe ser resuelta a favor del menor”. (Enfasis en el original). Informe de la Comisión de lo Jurídico sobre el Proyecto de la Cámara 1607, pág. 13.
Las ponencias presentadas durante las vistas públicas convergen en un punto en común: la conveniencia y el bien-estar de los niños y las niñas. Véanse: Ponencia del Depar-tamento de Servicios Sociales del Estado Libre Asociado de Puerto Rico de 28 de noviembre de 1994; Ponencia de la Fundación Pro-Ayuda de Puerto Rico de 30 de noviembre de 1994; Ponencia del Hogar Casa Cuna San Cristóbal, Inc. de 30 de noviembre de 1994, entre otras. Éstas no *1019 reflejan preocupación alguna sobre la subsistencia del vín-culo jurídico entre la persona adoptada y su familia bioló-gica cuando el Tribunal entiende que ello redunda en el mejor interés y bienestar del menor.
Finalmente, ambos proyectos se aprobaron con enmien-das, convirtiéndose en las Leyes Núm. 8 y Núm. 9 de 19 de enero de 1995. La primera de ellas reformaba el aspecto sustantivo y, por ende, enmendaba el Código Civil; la se-gunda se encargaba del aspecto procesal, enmendando así el Código de Enjuiciamiento Civil. En el aspecto sustantivo no prosperó la enmienda que dejaba a discreción del Tribunal, en el ejercicio de su parens patriae, la subsistencia del vínculo entre la persona adoptada y su familia biológica. Sin embargo, ni del debate legislativo ni de las ponencias circuladas se deduce que haya habido oposición. Lo que sí está claro es que no se consideraba deseable mantener nexo entre la persona adoptada y su parentela natural cuando ésta pudiese ser un escollo en la integración a la familia adoptiva.(18)
Recientemente, se aprobó la Ley de Reforma Integral de Procedimientos de Adopción de 2009, Ley Núm. 186 de 18 de diciembre de 2009, 32 L.P.R.A. secs. 2699-2699t (en adelante, Ley de Adopción de 2009). La Asamblea Legisla-tiva nos llama la atención y nos dice claramente que
...no podemos perder de perspectiva que el fundamento principal siempre debe ser el bienestar y la seguridad del menor, brindarle un ambiente adecuado en el hogar, de modo que se sienta amado y que se pueda desarrollar física, mental, social y moralmente, además de proveerle^ una convivencia sana, llena de orden, paz y tranquilidad. (Enfasis nuestro). Exposi-ción de Motivos de la Ley Núm. 186, supra.
Una y otra vez se ha repetido que la reforma del proceso *1020 “se levanta fuerte en pro del bienestar de nuestros menores”. Informe Positivo sobre el Proyecto de la Cámara 1657 de 17 de junio de 2009, pág. 2. Es por ello que la adopción no tiene otra finalidad que no sea “salvaguardar los derechos de los niños/as, proteger su salud y adelantar su bienestar”. Id., pág. 3.
Como hemos visto, nuestra legislación de adopción se ha ido modificando con el correr de los tiempos. De esta ma-nera, se ha acoplado a los nuevos retos que surgen como producto del desarrollo y del cambio social. Su objetivo principalísimo e inequívoco ha sido, desde siempre, promo-ver el mejor interés y bienestar de los menores, por encima de cualquier otra consideración. Con miras en ese norte nunca se ha vacilado en incorporar nuevas tendencias ju-rídicas, promulgando así legislación de vanguardia en cuanto a la adopción se refiere.
Históricamente, los pronunciamientos de esta Curia se han dirigido por la misma filosofía, salvo contadas excep-ciones,(19) hasta el punto de ser agentes catalíticos para cambios futuros en la legislación pertinente.(20) El Juez Asociado Señor Fuster Berlingeri expresó esta misma idea de la manera siguiente:
Parte importante de la evolución autóctona de nuestra fi-gura jurídica de la adopción ha sido su desarrollo jurisprudencial. En numerosas ocasiones ha sido este Tribunal el foro que ha atendido problemas y situaciones novedosas, pautando para ellas normas particulares que han ampliado y complementado nuestro acervo jurídico sobre la adopción. En efecto, en casos como Feliciano Suárez, Ex parte, [117 D.P.R. 402 (1986)]; Ex parte J.A.A., 104 D.P.R. 551 (1976); Rivera Coll v. Tribunal Superior, [103 D.P.R. 325 (1975)]; Ex parte *1021 Warren, 92 D.P.R. 299 (1965); Valladares de Sabater v. Rivera Lazú, 89 D.P.R. 254 (1963); Ex parte Ortiz y Lluberas, 42 D.P.R. 350 (1931), y otros, este Tribunal ha resuelto situacio-nes noveles, que no habían sido reguladas concretamente por el legislador, y hemos formulado las normas pertinentes. En los casos aludidos, para preceptuar la nueva pauta aplicable a la situación particular ante nuestra consideración, nos hemos guiado por dos principios medulares, a saber: (1) que el esta-tuto sobre adopción debe ser interpretado liberalmente a favor del adoptado, y (2) que el interés primordial que ha de prote-gerse es el bienestar del menor. (Enfasis nuestro y en el original). Pérez, Román v. Proc. Esp. Rel. de Fam., 148 D.P.R. 201, 238-239 (1999) (Fuster Berlingeri, J., Op. Disidente).(21)
B
Como hemos reiterado, el principal criterio a ponderar al conceder una petición de adopción es el mejor interés y bienestar del menor. Ello nos obliga a definir a qué nos referimos cuando invocamos tal concepto. Si bien no hemos tenido ocasión de delinear el alcance de este criterio en el contexto de una adopción, sí lo hemos hecho en casos de custodia. Así, en Perron v. Corretjer, 113 D.P.R. 593 (1982), impartimos unas guías a los tribunales de instancia para ser utilizadas al adjudicar la custodia de un menor. En aquella ocasión dijimos que
[un] Tribunal[,] para adjudicar de manera informada en quién debe recaer en última instancia la custodia [de un menor, tiene que ponderar los siguientes] factores [:] “la preferencia del menor, su sexo, edad, salud mental y física; el cariño que puede brindársele por las partes en controversia; la habilidad de las partes para satisfacer debidamente las necesidades *1022 afectivas, morales y económicas del menor; el grado de ajuste del menor al hogar, la escuela y la comunidad en que vive; la interrelación del menor con las partes, sus hermanos y otros miembros de la familia [,] y la salud psíquica de todas las partes. Ningún factor es de por sí decisivo. Hay que sopesarlos todos para juzgar de qué lado se inclina la balanza y al menos aproximarse al logro de la solución más justa en asunto de tan extrema dificultad.” (Énfasis nuestro y citas omitidas). Id., pág. 606.
Toda vez que la adopción y la custodia tienen el mismo fin: procurar el mejor bienestar e interés de nuestros niños, nada nos impide considerar los criterios delineados en ca-sos de custodia, al decidir si romper —o no— el vínculo jurídico existente entre la persona adoptada y su familia biológica. Estos criterios ayudan, especialmente, en casos donde la persona menor es adoptada por una sola persona con la que convivía de antemano.
IV
A
Como vimos anteriormente, de ordinario, la adopción en Puerto Rico supone la pérdida de los vínculos familiares con la familia biológica. El ordenamiento jurídico, sin embargo, establece dos instancias donde ello no ocurre. La primera, cuando quien adopta es el cónyuge del padre o la madre del adoptado. La segunda, cuando el adoptado pro-viene de una filiación única y es adoptado por alguien del sexo opuesto al padre o madre del adoptado. Véase Art. 138 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 539.
De acuerdo con lo anterior, si uno de los miembros de una pareja heterosexual que convive desea adoptar el hijo de su pareja, el padre o madre biológico no pierde el vín-culo parental con su hijo. Por el contrario, si la pareja la componen dos personas del mismo sexo, en esas circuns- *1023 tandas, la adopción comporta la pérdida de los lazos fami-liares del padre biológico.(22)
En Estados Unidos, innumerables tribunales se han en-frentado a controversias donde se plantea que quien adopta es la pareja del mismo sexo del padre o madre bio-lógico del adoptado y el ordenamiento jurídico del estado no contempla esta posibilidad y, si lo hace, provee para que el padre biológico pierda sus derechos parentales.(23) Ante esta realidad, esos foros, conscientes de que en casos de adopción prima siempre el mejor interés del menor y, en el ejercicio de su discreción judicial, han interpretado liberal-mente los estatutos que regulan la adopción para hacer realidad ese principio rector, permitiendo la adopción. Para ello, han incorporado a su ordenamiento la figura llamada Second Parent Adoption, concepto que traduciremos, como ya anticipáramos, como adopción por el segundo padre o madre funcional.(24)
*1024 Mediante esta figura se permite que la pareja afectiva de la madre biológica adopte al hijo de ésta sin que se ex-tingan las responsabilidades o los derechos derivados de la patria potestad. Es decir, se facilita la adopción sin sopor-tar la pérdida de los derechos parentales del padre o de la madre biológica. La jurisprudencia de vanguardia que se ha desarrollado procura reconocer los cambios sociales acaecidos en las últimas décadas y responde de esta forma a ellos, en pos de la equidad y la justicia, permitiendo que los niños tengan un padre y una madre, dos padres o dos madres legales, cuando ello adelanta los mejores intereses y el bienestar del menor. Véase E. Zuckerman, Comenta-rio, Second Parent Adoption for Lesbian-Parented Families: Legal Recognition of the Other Mother, 19 U.C. Davis L. Rev. 729 (1985-1986).
En este sentido, la adopción por el segundo padre o ma-dre funcional es una aplicación analógica de la adopción por el cónyuge del padre biológico o madre biológica, aun-que los requisitos pueden variar de estado a estado.
Estos foros han reconocido que permitir la adopción re-dunda en el mejor bienestar e interés del adoptado, pues ello aporta a su estabilidad emocional y añade garantías jurídicas al menor adoptado.(25) En ese sentido, facilita que el menor pueda recibir, además del afecto y la querencia de otro padre, los beneficios económicos que ese padre o ma-dre adoptante pueda proveer, como por ejemplo: beneficios del plan médico del adoptante; beneficios por incapacidad *1025 del padre adoptante; beneficios del seguro social, y otros beneficios, como derechos de sucesión por parte del adoptante. Además, si la relación afectiva entre los adultos termina, la niña tendrá derecho a pensión alimentaria y derechos de visita y custodia.
Asimismo, en caso de que la progenitora fallezca, la me-nor puede permanecer con quien le ha adoptado. De otra parte, la adoptante podría tomar decisiones médicas y con-sentir a tratamientos de salud, lo cual resultaría de bene-ficio para el bienestar de la adoptada en caso de que su progenitora no estuviese de momento disponible. S. Bryant, Second Parent Adoption: A Model Brief, 2 Duke J. Gender L. & Pol’y 233 (1995).(26)
Al igual que en la adopción tradicional, discutida ante-riormente, así como en la adopción sucesiva, también ex-plicada, la adopción por el segundo padre o madre funcio-nal se debe regir por el mejor interés y bienestar del menor. El mejor interés y bienestar del menor estará de-terminado por cualidades emocionales y materiales de sus padres o madres, además de la habilidad de éstos para impartir amor, cuidados, disciplina, orientación y todo aquello que los padres hacemos por nuestros hijos. Como en cualquier adopción, se deberán considerar los atributos personales de los padres o las madres, el hogar y su en-torno, los lazos emocionales que unen a ese menor con las personas adultas y viceversa, la deseabilidad de continuar con la relación que existiese al momento y la preferencia del niño o la niña. Igualmente se considerará la estabilidad de la familia, los efectos presentes y futuros de conceder el *1026 pedido como los de negarlo, cómo se acopla el niño o la niña al hogar, a la escuela, a la comunidad y, obviamente, la salud mental de los padres o las madres. Zuckerman, supra, págs. 737 y 747.
Es importante no perder de perspectiva que, en estos casos, los niños ya tienen una familia y conviven con sus padres o madres en el seno de un hogar. La función principal de la figura es reconocerle a ese niño o a esa niña los beneficios legales que derivan de que el ordenamiento ju-rídico reconozca a sus padres o madres como tales. En este sentido, se busca, a través de utilizar la adopción por la segunda madre funcional, equiparar la realidad biológica, fáctica, social, emocional y afectiva, con la realidad jurídica. Es deber del Estado garantizarles a estos niños los mismos derechos que tienen los que son adoptados por la pareja heterosexual de su madre o padre.
La mejor forma de garantizar la consistencia del esta-tuto en cuestión es velando que nuestra interpretación sea fiel a su propósito. En este caso particular, se logra salva-guardando el mejor interés del menor y ajustando sus dis-posiciones a la realidad social cambiante que, como vimos, incide sobre la institución de la adopción. Debemos, pues, matizar la letra de la ley y rechazar una interpretación restringida que implique derrotar el propósito para el que fue promulgada y la política pública que le sirve de sostén. Véase, e.g., J.S. Schacter, Constructing Families in a Democracy: Courts, Legislatures and Second-Parent Adoption, 75 Chi.-Kent L. Rev. 933 (1999-2000). Por ello, consi-dero que nada impide que al ejercer nuestra discreción adoptemos en nuestra jurisdicción la figura del segundo padre o madre funcional, pues ello redunda en el mejor interés y beneficio del menor.
*1027 B
Para resumir, como hemos visto, del texto de la ley en materia de adopción se deducen dos principios que en la controversia de autos están polarizados: (1) promover el mejor bienestar e interés de la persona adoptada, y (2) la expresión textual de que una persona adoptante no puede adoptar al hijo o hija de otra persona si ambas son del mismo sexo, pues ello implicaría la ruptura del vínculo ju-rídico entre la persona adoptada y su padre o madre. Ante el choque insalvable de intereses que presenta la contro-versia de autos, la mayoría de este Foro opta por el se-gundo, abandonando así lo que la prueba pericial ha reco-nocido que es el mejor interés de la menor JMAV.
De haber prevalecido entre la mayoría del Tribunal el valor jurídico del mejor interés de la menor, esta Curia hu-biera podido incorporar la figura del second parent adoption sin incurrir en lo que la mayoría conceptualiza inco-rrectamente como una violación al principio de separación de poderes. Esto, pues, al aplicar la figura del segundo padre o madre funcional estaríamos ejerciendo nuestro deber y poder constitucional de respetar la expresión legislativa de salvaguardar la política pública y principio rector de proteger el mejor bienestar e interés de la persona adoptada. Tal proceder judicial jamás interferiría con las funciones de las otras ramas de gobierno, sino todo lo con-trario, le daría mayor fuerza a nuestro esquema constitu-cional de separación de poderes.
A pesar de lo anterior, y contrario a la regla de autoli-mitación judicial de no decidir una cuestión constitucional antes de que sea necesario, o si hay otros fundamentos que permitan disponer del caso, E.L.A. v. Aguayo, 80 D.P.R. 552 (1958), la mayoría rechaza el proceder propuesto, por lo que debemos enfrentarnos al cuestionamiento de incons-titucionalidad del Art. 138 del Código Civil.
*1028 Pasamos, entonces, a evaluar detenidamente las distin-tas disposiciones constitucionales invocadas para luego en-marcar la validez de los señalamientos de la peticionaria en el contexto constitucional. Antes de ello, y en aras de matizar la elucubración desacertada de la Opinión del Tribunal sobre nuestro rol constitucional de interpretación judicial, conviene hacer unas expresiones al respecto.
V
En ocasiones se ha señalado que actos de interpretación judicial constituyen una intromisión indebida en el poder de legislar de la Asamblea Legislativa. Generalmente, es-tos señalamientos se dan en el contexto de una adjudica-ción constitucional y algunos de éstos, como el de la Opi-nión del Tribunal, son desacertados porque yerran en su interpretación sobre las funciones y los poderes constitu-cionales de este Foro. Entendemos que ésta es la contro-versia adecuada para profundizar sobre esa apreciación y sobre el rol de los tribunales en un Estado Constitucional de Derecho.
A
El Pueblo de Puerto Rico escogió organizar la comuni-dad política que compone “sobre una base plenamente democrática...”. Preámbulo de la Constitución, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 266. Entendió, ade-más, que la mejor manera de garantizar la democracia plena consistía en organizar el gobierno de la Isla en una división tripartita del poder constituido y adoptó la forma republicana de gobierno.(27) Art. I, Sec. 2, Const. E.L.A., *1029 L.P.R.A., Tomo 1. Además, de la misma forma que dividió al poder constituido, dejó establecido que éste quedaría su-bordinado al poder constituyente. Id.
Debemos notar que para que una Constitución sea de-mocrática no sólo es necesario que actúe como una limita-ción al poder del Gobierno, además deberá garantizar pre-ceptos básicos que consagren la dignidad de las personas, fuente de todos los derechos fundamentales. Véase J. Gar-cía Roca, Del principio de la división de poderes, 108 Rev. de Estudios Políticos (Nueva Epoca) 41 (abril-junio 2000).
En este sentido, y cónsono con las disposiciones consti-tucionales, se debe afirmar que en Puerto Rico impera un Estado Constitucional de Derecho. Así, el Poder Legisla-tivo aprueba las leyes, el Ejecutivo las ejecuta y el Poder Judicial es el encargado no sólo de interpretarlas, sino también de garantizar que éstas se ajusten a los principios plasmados en nuestra Constitución.
A diferencia de los modelos europeos de mediados del siglo XX, donde imperaba el Estado Legislativo de Dere-cho, en la Isla se adoptó el Estado Constitucional de Dere-cho proveniente de la tradición estadounidense y consoli-dado por el Tribunal Supremo federal en Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803). Como señala el jurista italiano, Luigi Ferrajoli:
En el modelo tradicional [europeo], paleopositivista y jacobino, el Estado de Derecho consistía básicamente en la primacía de la ley y la democracia en la omnipotencia de la mayoría y, por lo tanto, del Parlamento. El papel del juez como órgano sujeto sólo a la ley se configuraba, por consiguiente, como una mera función técnica de aplicación de la ley, cualquiera fuese su contenido. (Enfasis nuestro). M. Atienza y L. Ferrajoli, Juris-dicción y argumentación en el estado constitucional de dere-cho, México, Universidad Nacional Autónoma de México, 2005, pág. 89.
Sin embargo, señala el autor, aquel paradigma legisla- *1030 tivo cambia a partir de la segunda posguerra y se vuelca, entonces, al modelo constitucional de Estado de Derecho donde el legislador está sujeto a la Constitución. Atienza y Ferrajoli, op. cit., págs. 89-90. Véase, además, E. Rivera Ramos, El estado de derecho: aproximación al concepto, 81 (Núm. 4) Rev. Jur. U.P.R. 1113, 1119 (2012). Europa, luego de la debacle producida por los regímenes autoritarios que la dominaron, rescata el valor del constitucionalismo, ya imperante en Estados Unidos, como el garante de la demo-cracia y de los derechos fundamentales. Id.
Es de notar que ya en 1803 el Tribunal Supremo de Estados Unidos había dejado claro el carácter constitucio-nal del Estado de Derecho imperante en esa jurisdicción cuando sostuvo que “o la Constitución controla cualquier ley contraria a ésta o la Legislatura puede alterar la Cons-titución mediante una ley ordinaria”. (Traducción nuestra). Marbury v. Madison, supra, pág. 177. Más ade-lante, el Tribunal, en voz del Juez Presidente Marshall, se pregunta “[s]i una ley contraria a la Constitución es nula, ¿los tribunales están obligados a aplicarla no obstante su invalidez?”. (Traducción nuestra). Id. La respuesta es obvia. El Tribunal, entonces, concluye que las leyes apro-badas por el Congreso se deben ajustar a los preceptos cons-titucionales y que es el Tribunal Supremo el encargado de revisar su constitucionalidad.
Como último foro revisor de la constitucionalidad de las leyes, es nuestro deber cerciorarnos, mediante el control constitucional, que la legislación aprobada esté acorde con los principios que emanan de nuestra Carta Magna. Esta doctrina no es nueva, nuestra Constitución ya provee para esa revisión. Art. V, Sec. 4, Const. E.L.A. Esta revisión, pues, es parte de nuestra función.
Hoy, como veremos a continuación, la mayoría del Tribunal no sólo nos invita a una interpretación “originalista” del texto constitucional, sino que además nos convida a reconocer esa metodología adjudicativa como la única vá- *1031 lida cuando adjudicamos una controversia. Entiende que ésta es la única manera en que se puede evitar una viola-ción a la doctrina de separación de poderes.
B
La tesis de la mayoría, al evaluar la prohibición de dis-crimen por razón de sexo, es que su contenido quedó fijo al momento de su aprobación. Por lo que no cabe desviación alguna de lo indicado por los constituyentes cuando inter-pretamos una cláusula constitucional.(28) Esto quiere decir que los jueces, al adjudicar una controversia de carácter constitucional, deben retrotraerse al año 1952.(29)
La insistencia de aproximación al origen de la Constitu-ción en el análisis constitucional es, más que nada, una aproximación histórica, pues propone que el significado de una cláusula constitucional quede congelado cuando se aprueba, fijándose allí su contenido de una vez y por todas. Esta metodología, sin embargo, no es la más apropiada para abordar los derechos de las parejas del mismo sexo, puesto que es en la historia donde está el origen de la discriminación. Lo cierto es que el contenido de la disposi-ción constitucional que hoy abordamos “va redefiniéndose con la evolución de la conciencia social, y si ello no fuese así *1032 las Constituciones estarían condenadas a ir pereciendo en un proceso de alejamiento de la realidad que deben disciplinar”. Sentencia del Tribunal Constitucional de Es-paña, STC 179/2012 de 6 de noviembre de 2012 (BOE Núm. 286 de 28 de noviembre de 2012).(30)
Ésta fue la postura que prevaleció al aprobarse nuestra Constitución. La Escuela de Administración Pública, en su estudio sobre la Constitución, propuso lo siguiente:
[U]n documento constitucional será tanto más válido y efec-tivo en cuanto corresponda a la cultura y constituya una sín-tesis fiel del peculiar estilo de vida política y social de un pueblo. Significa, por lo tanto, mucho más que un cuerpo de reglas jurídicas. Mientras más se aproxime la carta constitu-cional a la idea de servir como interpretación, instrumento y guía del rumbo que lleva una sociedad, más vivos serán su significado, respetabilidad y eficacia.

Las disposiciones constitucionales sobre las cuestiones de primera importancia tienen que ser, por necesidad, de carácter general y flexible. En lo posible, deben evitar especificaciones que las conviertan en obsoletas e inaplicables frente a las even-tualidades del futuro.

Como en todo intento de formular normas básicas, la espe-cificación exagerada de los detalles es una garantía ilusoria de efectividad, que sólo sirve para dramatizar la impotencia de la regla frente a la complejidad y variabilidad de las situaciones humanas. Los preceptos constitucionales de alto rango tienen que ser principios que consientan un margen discrecional para reglamentar ante circunstancias imprevistas y hasta imprevi-sibles ele acuerdo con los ideales de conducta establecidos en ellos. (Enfasis en el original). La Nueva Constitución de Puerto Rico, Escuela de Administración Pública, Río Piedras, Ed. U.P.R., 1954, págs. 122-123.
Esta tesis que postula que nuestra Constitución es un documento vivo se hace particularmente evidente cuando auscultamos el significado de varias de las disposiciones de la Carta de Derechos. Me explico.
*1033 Como sabemos, el principio fundamental sobre la invio-labilidad de la dignidad humana impone como consecuen-cia necesaria el trato igualitario ante la ley. Así, el Artículo II, Sección 1, de la Constitución de Puerto Rico establece que “[l]a dignidad del ser humano es inviolable. Todos los hombres son iguales ante la Ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, naci-miento, origen o condición social, ni ideas políticas o religiosas”.(31) Art. II, Sec. 1, de la Carta de Derechos, Const. E.L.A., ed. 2008, pág. 272. Esa disposición se debe considerar conjuntamente con la See. 7 de la Carta de De-rechos que, en lo pertinente, dispone: “Ninguna persona será privada de su libertad o propiedad, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes”. Art. II, Sec. 7, Const. E.L.A., pág. 296.
A pesar de que son varias las cláusulas constitucionales relacionadas con el principio de igual protección de las le-yes, el principio de igualdad ante la ley prescrito en la See. 1 del Art. II de la Constitución de Puerto Rico se proyecta como una protección a la dignidad personal en su forma más amplia y completa. 4 Diario de Sesiones de la Conven-ción Constituyente de Puerto Rico 2566 (1951). La ampli-tud de la primera oración de la citada sección —“La digni-dad del ser humano es inviolable”— en conjunto con el principio de que “[t]odos los hombres son iguales ante la Ley” sugiere una protección que se extiende más allá de las formas de discrimen expresamente enumeradas en su *1034 texto. Así, en lo que respecta a la garantía constitucional sobre la igual protección de las leyes, el texto y el origen de la primera sección de la Carta de Derechos de la Constitu-ción de Puerto Rico revelan una protección de mayor al-cance que la provista por la Constitución federal.(32) Según expondremos a continuación, ya nuestros constituyentes nos indicaron cómo debemos interpretar nuestro docu-mento.
Nuestros constituyentes fueron claros cuando expresa-ron que los principios de igualdad ante la ley y de la dig-nidad humana quedan
... por encima de accidentes o diferencias, bien tengan su ori-gen en la naturaleza o en la cultura. Todo discrimen o privile-gio contrario a esta esencial igualdad repugna al sistema jurí-dico puertorriqueño. En cuanto fuera menester nuestra organización legal queda robustecida por la presente disposi-ción constitucional, a la vez que obligada a ensanchar sus dis-posiciones para dar plena realización a lo aquí dispuesto. (En-fasis nuestro). Diario de Sesiones de la Convención Constituyente, supra, pág. 2561.
Esta expresión del constituyente expone, entre otras co-sas, el canon interpretativo que nos debe guiar al atender controversias donde se plantee un trato discriminatorio cuyo efecto es lacerar la dignidad del ser humano. En estos casos, los constituyentes decretaron que tenemos que en-sanchar la disposición constitucional para dar plena reali-zación al texto constitucional.(33) Sólo así cumplimos con el mandato constitucional contenido en el Art. II, Sec. 19 de la Constitución, pág. 379, donde se dispone que “[l]a enu-meración de derechos que antecede no se entenderá en forma restrictiva ni supone la exclusión de otros derechos pertenecientes al pueblo en una democracia, y no mencio- *1035 nados específicamente”. Obsérvese que la propia Constitu-ción también nos provee la base de un canon interpretativo en materia de la Carta de Derechos.
Don Jaime Benitez, al presentar al seno de la Constitu-yente el Informe sobre la Carta de Derechos explicó que este articulado constitucional recogía dos cánones de interpretación. El primero de ellos, el que nos atañe, tenía como objetivo
... proteger los derechos del individuo contra una interpreta-ción restrictiva o contra una interpretación basada en la cono-cida norma de inclusio unius, exclusio alterius. Según este úl-timo principio interpretativo, el acto de enumerar conlleva el acto de excluir, de suerte que todo lo que no se menciona queda por ese solo hecho descartado. No creemos que en una constitución deba incorporarse un principio de esta inflexibili-dad... Una interpretación en el sentido de que todo lo que no se desprenda literalmente de cada una de las palabras usadas está por lo tanto excluido de la protección constitucional, sería contraria a la actitud básica que ha regido a la Comisión al preferir el lenguaje breve de los grandes principios en vez de la formulación minuciosa de los detalles inagotables. (Énfasis nuestro). Diario de Sesiones de la Convención Constituyente, supra, pág. 2576.(34)
El delegado Sr. Benitez expresa que nuestra Carta de Derechos recoge la “protección más liberal de los derechos del individuo...”. Íd. Nos corresponde a nosotros, los jue- *1036 ces puertorriqueños, hacer realidad el mandato constitu-cional de nuestro máximo documento impartiéndole actua-lidad a los derechos individuales, de suerte que cumplamos con nuestra obligación constitucional de proveer esa pro-tección más abierta y tolerante “de los derechos del individuo”. íd. No debemos, por lo tanto, ningunear nues-tra Carta de Derechos. La Constitución que interpretamos es la del Estado Libre Asociado de Puerto Rico, no otra, por lo que debemos atenernos al canon interpretativo que sus forjadores instruyeron para garantizar lo plasmado en la Sec. 19 del Art. II de la Constitution.(35)
Es con este marco interpretativo, ordenado por la Cons-titución, que tenemos que considerar los argumentos cons-titucionales que utiliza la peticionaria.(36)
Con honestidad intelectual hay que reconocer que si *1037 algo nos revela la discusión anterior, es todo lo contrario de lo que propone la mayoría. Nuestras cláusulas constitucio-nales no son prisioneras del tiempo. Por el contrario, tiene que procurarse, para preservar el documento, que éstas respondan a las necesidades de los tiempos. El llamado de la mayoría a adoptar un método constreñido de análisis sólo sirve para desvirtuar la Constitución y asimilarla a algo que es ajeno a nuestra realidad histórica.
Al margen de lo que diga la mayoría, lo cierto es que el texto constitucional no está integrado por palabras fósiles, sino más bien “es un árbol vivo que a través de una inter-pretación evolutiva se acomoda a las realidades de la vida moderna como medio para asegurar su propia relevancia y legitimidad”. STC 180/2012 de 6 de noviembre de 2012, supra. Y es que, como indica el profesor José Julián Alvarez González, “las constituciones más exitosas son aquellas que mejor sirv[e]n para cerrar la brecha entre derecho y realidad...”. J.J. Alvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos: casos y materiales, Bogotá, Ed. Temis S.A., 2009, pág. 2.
Impartir justicia requiere mucho más que la aplicación automática de la ley acorde a la lógica formal y al supuesto significado “original”. En raras ocasiones nos encontrare-mos con situaciones de hechos que se ajusten perfecta- *1038 mente a la norma jurídica. Por el contrario, la mayoría de las veces se requiere que escudriñemos no sólo la disposi-ción del estatuto que aplica, sino también su totalidad e historial legislativo, el origen de la disposición, su transfor-mación histórica, cómo se ha ido ajustando a los tiempos, posibles anacronismos, las evoluciones sociales, entre otras consideraciones.(37) Además, y más importante aún, la-ad *1039 judication constitucional nos exige que seamos particular-mente celosos cuando tenemos ante nuestra consideración minorías históricamente discriminadas.
VI
La peticionaria alega que el Art. 138 del Código Civil es inconstitucional por varias razones. Primero, porque sin justificación alguna trata de manera desigual a personas igualmente situadas, lo que constituye una violación al principio constitucional de igual protección de las leyes. Segundo, porque promueve un discrimen por razón de sexo o género y orientación sexual, violando la dignidad de la peticionaria. Y tercero, porque trata de manera desigual a la adoptada por razón de nacimiento. Veamos los primeros dos señalamientos de la peticionaria.
A
Como sabemos, la cláusula constitucional que mandata la igual protección de las leyes no requiere un trato igual a toda la ciudadanía, sino que proscribe un trato desigual injustificado. Sin embargo, el Estado, aunque puede clasi-ficar, al hacerlo tiene que tratar de manera similar a per-sonas similarmente situadas. López v. E.L.A., supra. Al analizar la razonabilidad de una clasificación estatal debe-mos preguntarnos, como cuestión de umbral, si la clasifi-cación que se impugna incide sobre un derecho fundamental o si establece una clasificación sospechosa. De *1040 responder afirmativamente a alguna de estas dos interro-gantes, el análisis constitucional deberá realizarse según el crisol del escrutinio estricto. López v. E.L.A., supra, pág. 299.
Se entiende que una clasificación es sospechosa cuando no guarda relación con la habilidad o aptitud de la persona a quien afecta. Zachry International v. Tribunal Superior, 104 D.P.R. 267, 277 esc. 9 (1975). En Wackenhut Corp. v. Rodríguez Aponte, 100 D.P.R. 518, 531 (1972), indicamos que se considerará una clasificación inherentemente sospe-chosa aquélla que trastoque “la dignidad humana y... el principio de que todo el mundo es igual ante la ley”.(38) Las clasificaciones expresamente establecidas o enumeradas en la Constitución se consideran clasificaciones inherente-mente sospechosas. Zachry International, supra, págs. 278-279. En estos casos se requiere, para sostener la vali-dez de la ley, que el Estado demuestre que el estatuto o la actuación impugnada persiguen un interés estatal apre-miante, y que el criterio diferenciador es necesario para alcanzar ese interés.
Por otro lado, si la clasificación no afecta un derecho fundamental ni establece una clasificación sospechosa, el escrutinio que se debe utilizar es el de nexo racional o tra-dicional mínimo. Zachry International v. Tribunal Superior, supra. En este último caso, una clasificación será vá-lida a menos que no exista un nexo racional entre ésta y un interés legítimo del Estado. Mercado Vega v. U.P.R., 128 D.P.R. 273 (1991). Esto nos obliga a plantearnos qué es un interés legítimo y cómo sabemos cuándo está presente.
Este enfoque de análisis, que utiliza sólo dos niveles de evaluación —el riguroso y el laxo— plantea dificultades, por lo que no ha estado exento de críticas. Se reprueba esta *1041 categorización, entre otras razones, pues se basa en la su-posición de que los pleitos sobre la igual protección de las leyes son divisibles en sólo dos nítidas y precisas clasifica-ciones, cuando ello no necesariamente es así. Esta división bipartita limita la discreción del juez al adjudicar, pues lo obliga a evaluar la clasificación rigurosamente o a mostrar una gran deferencia al criterio legislativo. Véase Hermina González v. Srio. del Trabajo, 107 D.P.R. 667, 680 (1978) (Trías Monge, J., Op. disidente). A medida que la sociedad avanza, estos niveles de análisis se revelan insuficientes.
En atención a ello, el Tribunal Supremo de Estados Uni-dos tuvo que reconocer un tercer modelo de escrutinio para considerar reclamos sobre derechos que no se encontraban nítidamente enumerados en su Constitución. Es así cómo se crea el llamado escrutinio intermedio. Este se utiliza cuando se está ante “intereses individuales importantes, aunque no sean necesariamente fundamentales, y [se usan] criterios sensitivos de clasificación, aunque no sean necesariamente sospechosos”. (Enfasis nuestro). León Rosario v. Torres, 109 D.P.R. 804, 814 (1980). Con lo cual, la creación de este nivel de análisis fue la respuesta que ofre-ció el Tribunal Supremo federal ante los cambios sociales producidos en la sociedad norteamericana que reconocía, cada vez más, la igualdad de los sexos y exigía un método de análisis más riguroso cuando se establecieran diferen-cias sobre este fundamento. Véase Reed v. Reed, 404 U.S. 71 (1971).
De acuerdo con este escrutinio desaparece la presunción de constitucionalidad de la ley, y la clasificación puede ser permisible si se demuestra la existencia de un interés pú-blico importante y si existe una relación sustancial entre la ley y el propósito legislativo. El propósito legislativo tendrá que ser expreso cónsono con la importancia de los intereses involucrados. Los tribunales, además, deben auscultar si existen otros propósitos impermisibles ocultos en el esta- *1042 tuto más allá de los expresados por el legislador. Véanse: Treatise on Constitutional Law: Substance and Procedure Secs. 18.20-18.24 (2008); G. Gunther, The Supreme Court, 1971 Term, Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv. L. Rev. 1 (1972).
Hasta ahora, en Puerto Rico no habíamos tenido la ne-cesidad de adoptar este escrutinio de análisis ante la ri-queza de nuestra Carta de Derechos. Ahora bien, nada con-traindica que, en circunstancias en las que las clasificaciones impugnadas “repugn[en] a la conciencia por estar basada [s] en prejuicios o motivaciones ilegítim[a]s o por ser injusta[s]”, afectando derechos o intereses indivi-duales importantes (aunque no fundamentales por no en-contrarse enumerados en el texto constitucional), adopte-mos un nuevo nivel de análisis de carácter intermedio. Wackenhut Corp. v. Rodríguez Aponte, supra, pág. 530. No hay duda de que las clasificaciones estatutarias pueden ser imperfectas, lo que es impermisible es que se basen en el discrimen o en motivaciones ilegítimas que laceren princi-pios importantes para nuestra convivencia en sociedad. Para atender estos reclamos es imprescindible un escruti-nio de interpretación constitucional intermedio.
B
Como señaláramos anteriormente, la Constitución pro-híbe expresamente el discrimen por razón de sexo. Art. II, Sec. 1, Const. E.L.A. Lo anterior nos lleva indefectible-mente a definir el concepto sexo en relación con la prohibi-ción constitucional.
El Informe sobre el discrimen por razón de género en los Tribunales de Puerto Rico (agosto de 1995) (Informe de la Rama Judicial) distingue entre sexo y género. Expresa que el término sexo se utiliza “para referirse únicamente a las *1043 características biológicas que se han utilizado para distin-guir entre los hombres y las mujeres”. íd., pág. 18.
Género, no obstante, se refiere a
... la construcción histórico-social que se ha hecho de las ca-racterísticas que se consideran definitorias de los hombres y de las mujeres y de los comportamientos esperados de los unos y de las otras en nuestra sociedad... El género... no es, pues, una realidad “natural”, sino el resultado de las creencias y entendidos que se han ido generando social y culturalmente sobre cuáles deben ser los comportamientos y funciones de los hombres y las mujeres en todos los aspectos de la vida, desde los relacionados con la sexualidad hasta los que tienen que ver con el desempeño de determinadas actividades y ocupaciones en una comunidad dada. íd.
Ante las limitaciones intrínsecas al vocablo sexo, la Co-misión que estudió el problema de discrimen por género en la Rama Judicial optó por adoptar la palabra género para “referirse a las circunstancias y problemas relacionados con las diferencias de trato hacia hombres y mujeres en nuestro medio”. íd., pág. 19.
Las preguntas que debemos hacernos en esta coyuntura son las siguientes: ¿Es nuestra Constitución tan inflexible que la única modalidad de discrimen por sexo incluida en su texto es la que se refiere a las características biológicas que distinguen entre los hombres y las mujeres? ¿El discri-men por sexo puede incluir algo más? ¿Es el discrimen por razón de género una modalidad de discrimen por razón de sexo y, por lo tanto, objeto de protección constitucional? ¿Qué escrutinio le aplica?
Sostengo que el discrimen por género merece protección constitucional. Ello es así por varios fundamentos. Pri-mero, porque sólo de esta forma podemos ser consistentes con el mandato constitucional de la Sec. 19 del Art. II. Esta interpretación es la única que nos permite proveer la “pro-tección más liberal de los derechos del individuo”, como nos ordena la Constitución. Véase Diario de Sesiones de la Convención Constituyente, supra, pág. 2576. Además, éste *1044 es el único resultado lógico al que podemos llegar. Me explico. El discrimen por razón de género constituye un discrimen por razón de sexo porque las clasificaciones re-lacionadas con el género se establecen, necesariamente, en relación con el sexo de la persona. El profesor Koppelman lo explica de la manera siguiente:
As a matter of definition, if the same conduct is prohibited or stigmatized when engaged in by a person of one sex, while it is tolerated when engaged in by a person of the other sex, then the party imposing the prohibition or stigma is discriminating on the basis of sex... If a business fires Ricky, or if the state prosecutes him, because of his sexual activities with Fred, while these actions would not be taken against Lucy if she did exactly the same things with Fred, then Ricky is being discriminated against because of his sex. If Lucy is permitted to marry Fred, but Ricky may not marry Fred, then (assuming that Fred would be a desirable spouse for either) Ricky is being discriminated against because of his sex. A. Koppelman, Why Discrimination Against Lesbians and Gay Men is Sex Discrimination?, 69 (Núm. 2) N.Y.U. L. Rev. 197, 208 (1994).
Además, este resultado viene dado porque la modalidad de discrimen por razón de género atiende a los principios que subyacen la prohibición del discrimen por razón de sexo. Este Tribunal ha expresado que la prohibición de dis-crimen por razón de sexo requiere descartar “concepciones jurídicas desfasadas y estereotipadas que suponen supues-tas inferioridades de la mujer”, así como “ ‘premisas subje-tivas, erróneas, tradicionales y estereotipadas que emanan de una visión masculina que consciente o inconsciente-mente tiene [n] su razón de ser en la caracterización de la mujer como sexo débil’ ”. Milán Rodríguez v. Muñoz, 110 D.P.R. 610, 615 (1981).
Igualmente, hemos reconocido que están prohibidas aquellas clasificaciones que surjan como producto de “me-ras conjeturas, prejuicios arcaicos y nociones estereotipa-das, con abstracción de las características verdaderas de los miembros del género femenino”. (Énfasis nuestro). Com. de la Mujer v. Srio. de Justicia, 109 D.P.R. 715, 733 *1045 (1980). Las meras conjeturas, prejuicios arcaicos y nocio-nes estereotipadas se refieren al uso del sexo —entendido como la mera diferencia anatómica— para construir lo que es propio del hombre y lo que es propio de la mujer. M. Lamas, Géneros, diferencias de sexo y diferencia sexual, en Identidad femenina y discurso jurídico, (Alicia E.C. Ruiz comp.), Buenos Aires, Ed. Biblos, 2000, pág. 65.
Nuestras expresiones en estos casos van dirigidas a que en la medida en que construcciones sobre el género son base para perpetuar desigualdades entre las mujeres y los hombres, las mismas deben estar incluidas en el marco de la protección constitucional contra el discrimen por razón de sexo.(39) En ese sentido, el concepto género permite aten-der de una manera más abarcadora “las circunstancias y problemas relacionados con las diferencias de trato hacia hombres y mujeres...”.(40) Todo lo cual me lleva a concluir que el discrimen por género es una modalidad del discri-men por sexo.
Dicho esto, resta entonces determinar qué escrutinio de análisis constitucional le aplica a esta modalidad de discri-men por sexo. Para estos casos utilizaría el escrutinio in-termedio al que me he referido. Debe advertirse que el dis-crimen por razón de género no está expresamente enumerado en la Carta de Derechos de la Constitución de Puerto Rico, por lo que considero que el criterio de escruti-nio que debemos aplicar es el intermedio.(41) No se puede evaluar esta controversia bajo un examen laxo de escruti- *1046 nio tradicional porque ello facilitaría la discriminación ba-sada en premisas estereotipadas y prejuicios arcaicos o mo-tivaciones injustas o ilegítimas sobre los roles que le corresponden a cada cual en función de su sexo. Debido a que las clasificaciones que se establecen en función de es-tos estereotipos hieren nuestra conciencia colectiva y afec-tan intereses individuales importantes, el escrutinio apli-cable debe ser el intermedio. Solo así procuramos la “protección más liberal de los derechos del individuo”. Dia-rio de Sesiones, supra, pág. 2576.
Por todo lo anterior, ante un discrimen por razón de género, el Estado debe demostrar la existencia de un inte-rés público importante y la relación sustancial entre tal discrimen y el propósito legislativo.
VII
A
Indicamos previamente que la peticionaria arguye que el Art. 138 del Código Civil constituye también una viola-ción por orientación sexual. Nuevamente, ¿tal discrimen goza de protección constitucional? Veamos.
Se entiende por orientación sexual la atracción emocio-nal, romántica o afectiva duradera hacia otra persona. Esta atracción se puede sentir hacia una persona del sexo opuesto, en cuyo caso hablamos de heterosexualidad; hacia una persona del mismo sexo, en cuyo caso hablamos de homosexualidad', o hacia personas de ambos sexos, en cuyo caso hablamos de bisexualidad.(42) Véase A.M. Mooney Cotter, Ask No Questions: An International Legal Analysis on Sexual Orientation Discrimination, Surrey, Ashgate, 2010, págs. 7-8.
*1047 Tradicionalmente, y como parte de los comportamientos asignados al hombre y a la mujer por razón de su constitu-ción anatómica, se ha privilegiado la heterosexualidad so-bre la homosexualidad y la bisexualidad. Esto es así por-que, como señala el Informe de la Rama Judicial, “[l]a homosexualidad y el lesbianismo contradicen las caracte-rísticas aceptadas por las visiones prevalecientes sobre lo que es ser mujer y lo que es ser hombre y sobre la comple-mentariedad de los sexos”. íd., pág. 25. De la misma ma-nera, el Dr. José Toro Alfonso sostiene que “la homosexua-lidad es rechazada porque rompe con el esquema social pre establecido de familia, de los roles sexuales, de la compe-tencia entre los hombres y del balance de poder que siem-pre ha existido en la relación-hombre mujer”. J. Toro Alfonso, Masculinidades subordinadas, San Juan, Publica-ciones Puertorriqueñas, 2008.
En estos casos, el discrimen es mucho más que una cla-sificación inocente. El discrimen es un trato injusto y des-igual a una persona basándose en el grupo o categoría a la cual pertenece. Mooney Cotter, op. cit., pág. 8. En el con-texto de la orientación sexual, el resultado de favorecer una conducta u orientación sexual sobre las otras ha su-puesto el discriminen y la marginación del proceso político y democrático de quienes no se ajustan a la conducta sexual primada. La propia Opinión del Tribunal reconoce que la homofobia se ha engendrado en la sociedad como consecuencia de visiones históricas y culturales. Véase Opinión del Tribunal, acápite V.B. No podemos negar, en-tonces, que al discrimen por orientación sexual le subyacen prejuicios y estereotipos fuertemente arraigados en la sociedad.
Considero que las distinciones basadas en la orientación sexual son una modalidad de discrimen por género, por lo que, a su vez, están subsumidas bajo la categoría de discri-men por sexo, aun cuando no impliquen, necesariamente, un trato desigual para los hombres o las mujeres como *1048 categoría. Ello es así, precisamente, por los mismos argu-mentos expresados anteriormente, a saber: porque el dis-crimen por orientación sexual como cuestión lógica está ba-sado en el sexo de la persona, ya que le impide a una persona de determinado sexo acceder a un derecho al que tendría acceso si fuera del sexo contrario, y segundo, por-que una ley que no favorezca ni a los hombres ni a las mujeres como categoría, pero que en su aplicación discri-mine por orientación sexual, constituye un discrimen por razón de género que se relaciona con las desigualdades en-tre los sexos que en principio rechazó la Constitución.
El propio Informe de la Rama Judicial así lo reconoce al indicar que
... el discrimen por orientación sexual constituye discrimen por razón de género. En estos casos se dispensa un trato dis-criminatorio contra una persona por razón de que ha optado por comportamientos, incluyendo los relativos a la sexualidad, que se diferencian de aquellos que se han asignado tradicio-nalmente a los hombres y a las mujeres en virtud de su sexo. (Escolio omitido). íd., pág. 24.
B
El discrimen por orientación sexual está cobijado tam-bién en el Art. II, Sec. 1 de nuestra Constitución que, como vimos, prima el valor de la dignidad del ser humano. Véase C. Ramos González, La inviolabilidad de la dignidad hu-mana: lo indigno de la búsqueda de expectativas razona-bles de intimidad en el derecho constitucional puertorri-queño, 42 Rev. Jur. U.I.P.R. 185 (2011). No hay duda de que el discrimen por orientación sexual tiene sus propias características. Así lo reconoce el Informe de la Rama Judicial al indicar:
No debe perderse de vista... que [aunque el discrimen por orientación sexual constituye una modalidad del discrimen por razón de género,] en muchos sentidos el discrimen por razón de orientación sexual exhibe sus propias características. *1049 Las personas sometidas a este tipo de discrimen sufren expe-riencias específicas de menoscabo que no son idénticas a las de las mujeres y los hombres heterosexuales a quienes se les dis-crimina por ser mujeres o por ser hombres. En relación con los hombres homosexuales y las mujeres lesbianas circulan este-reotipos particulares. Más aún, muchas veces el discrimen asume formas peculiares y puede manifestarse en contextos distintos al de otras formas de discrimen por razón de género. Informe de la Rama Judicial, supra, pág. 25.
Precisamente, son esos estereotipos que se asumen, los que conducen a actitudes de menoscabo y de discrimen que nos obligan a reflexionar sobre el principio de dignidad hu-mana que recoge nuestra Constitución.
“[E]l carácter digno de una persona no se pierde por su preferencia u orientación sexual. El derecho al libre desa-rrollo de la personalidad posibilita que las personas elijan su modo de vida, incluso si el modo de vida escogido no es de aceptación de la mayoría”. R. Villanueva Flores, Protec-ción constitucional de los derechos sexuales y reproducti-vos, San José, Instituto Interamericano de Derechos Hu-manos, Editorama S.A., 2008, pág. 125. Por lo tanto, el discrimen por orientación sexual incide sobre la dignidad individual, pues constituye una barrera para el pleno de-sarrollo de la personalidad.
En ese sentido, resulta ilustrativo el análisis de la Corte Constitucional de Colombia al declarar la inconstituciona-lidad de una ley que calificaba la homosexualidad como una causal de mala conducta de los profesores de colegios públicos, lo que posibilitaba su despido. Sentencia C-481 de 9 de septiembre de 1998 de la Corte Constitucional de Colombia. En esa ocasión, la mencionada Corte expresó que “la preferencia sexual y la asunción de una determi-nada identidad sexual —entre ellas la homosexual— hacen parte del núcleo del derecho fundamental al libre desarro-llo de la personalidad...”. íd., Acápite VIII, pár. 22. La Corte Constitucional de Colombia expuso que la clasifica-ción en cuestión debía examinarse según un escrutinio es-tricto, entre otras razones, porque los homosexuales cons- *1050 tituyen un grupo tradicionalmente discriminado y, además, porque “si la preferencia sexual es libremente es-cogida, entonces se estaría limitando a un grupo de perso-nas —los homosexuales— el libre desarrollo de su persona-lidad, mientras que a los heterosexuales se le asegura el pleno goce de ese derecho en materia sexual.” Id., pár. 24. La Corte Constitucional concluyó, por lo tanto, que separar a un profesor de su trabajo por esa razón se funda “en un prejuicio sin asidero empírico alguno, que denota la injusta estigmatización que ha afectado a esta población y que se ha invocado para imponerle cargas o privarla de derechos, en detrimento de sus posibilidades de participación en ám-bitos tan relevantes de la vida social y económica”. Id., pár. 29.
Recientemente, la Corte Interamericana de Derechos Humanos sostuvo que Chile vulneró los derechos de Karen Atala, magistrada chilena, al quitarle la custodia de sus tres hijas debido a su orientación sexual. La Corte Intera-mericana basó su dictamen en tres razones principales, a saber: (1) la orientación sexual es un componente esencial de la identidad de la persona; (2) la comunidad homosexual ha sido históricamente discriminada y es común el uso de estereotipos respecto a ésta; (3) la comunidad homosexual constituye una minoría a la cual le resulta mucho más difícil remover los discrímenes en su contra a través del pro-ceso político y democrático. Véase Atala Riffo y niñas v. Chile, Sentencia de 24 de febrero de 2012 de la Corte Inte-ramericana de Derechos Humanos, pág. 34 esc. 114. Los señalamientos de la Corte Interamericana de Derechos Humanos son cónsonos con los pronunciamientos de otras cortes internacionales como el Tribunal Europeo de Dere-chos Humanos. Véanse, entre otros: Dudgeon v. Reino Unido, de 22 de octubre de 1981; Rees v. Reino Unido, de 17 de octubre de 1986; Christine Goodwin v. Reino Unido, de 1 de julio de 2002; Silva Mouta v. Portugal, de 21 de marzo de 2000.
*1051 En Lozada Tirado et al. v. Testigos Jehová, 177 D.P.R. 893, 945 (2010) (Rodríguez Rodríguez, J., Op. de conformi-dad), expresé que la dignidad humana tiene como funda-mento la propia libertad y autonomía del individuo. Im-plica “una empresa continua de autorrealización que se manifiesta en la autodeterminación consciente y responsa-ble de la propia vida y que lleva consigo la pretensión al respeto por parte de los demás”. íd. Véase G. Peces-Barba Martínez, La dignidad de la persona desde la filosofía del Derecho, 2da ed., Madrid, Ed. Dykinson, 2003, pág. 68.
La orientación sexual, pues, representa una expresión de la libertad interna de un individuo; es una irisación de la dignidad humana a la que somos acreedores por naci-miento; es parte de la naturaleza íntima de una persona que le acompaña en su desarrollo humano y le conduce a su propia autorrealización. La orientación sexual de un in-dividuo constituye así un asunto que se inscribe dentro del ámbito de su autonomía individual y que le permite adop-tar, sin coacciones ajenas, los proyectos de vida que consi-dere pertinentes. En tal sentido, todo trato desigual que se funde en móviles de opción sexual, en principio, está cons-titucionalmente prohibido. Por ende, toda distinción sus-tentada en esta condición constituye una clasificación im-permisible que nos requiere aplicar un análisis constitu-cional de rigor.
Al igual que expresamos con relación al discrimen por razón de género, una vez reconocido que las clasificaciones inherentemente sospechosas se encuentran enumeradas en la Constitución, Zachry International v. Tribunal Superior, supra, la aplicación de un escrutinio estricto para con-troversias de discrimen por orientación sexual nos alejaría del acercamiento constitucional anterior. No obstante, si siguiéramos el acercamiento dicotómico de este Tribunal de aplicar el escrutinio tradicional en defecto del estricto, estaríamos facilitando la práctica de discrimen contra gru-pos histórica y políticamente marginados. Ello nos posicio- *1052 naría en tener que aplicar a una controversia jurídica que incida sobre valores prominentes de dignidad humana, li-bertad y autonomía del individuo, un examen laxo que no permita proteger intereses importantes de las personas.
Por lo anterior, y análogo al trato dado al discrimen por razón de género, al seleccionar el estándar judicial aplica-ble al discrimen por orientación sexual, éste se debe anali-zar como una clasificación en sí misma dentro de la rigu-rosidad del escrutinio intermedio que hemos adoptado.(43) Por tratarse la orientación sexual de un interés individual importante dentro de la autorrealización y la dignidad de una persona, el Estado debe demostrar la presencia de un propósito público importante, además de demostrar la re-lación sustancial entre el interés público y el discrimen en cuestión. Nuevamente, es esta interpretación la que esta-mos obligados constitucionalmente a efectuar para garan-tizarle al ciudadano la mayor protección posible de sus de-rechos, mediante el ensanchamiento de las disposiciones de la Carta de Derechos. Diario de Sesiones, supra, págs. 2561-2576.(44)
*1053 VIII
Hasta aquí hemos evaluado los argumentos de la peti-cionaria según la Constitución del Estado Libre Asociado de Puerto Rico exclusivamente. Y hemos llegado a la con-clusión de que, de acuerdo con nuestra Constitución, la cla-sificación establecida en el Art. 138 es una clasificación cuasisospechosa, por lo que se debe analizar utilizando un escrutinio de carácter intermedio.
Conviene en este momento, además, revisar la clasifica-ción establecida en el Código Civil según la Constitución de Estados Unidos, repasando una jurisprudencia estadouni-dense que considera, entre otras cosas, que aún utilizando un escrutinio laxo, hay ciertas clasificaciones que para es-tablecerlas ameritan una evaluación rigurosa de los funda-mentos esgrimidos por el legislador. La mayoría, dicho sea de paso, ignora parte de esa jurisprudencia en su dictamen. Veamos.
A
El Tribunal Supremo federal ha desarrollado una línea de casos en los que, ante cuestionamientos bajo la cláusula de igual protección de las leyes y aplicando el estándar laxo de nexo racional, concluyen que procede revisar con rigor las justificaciones esgrimidas por el legislador al es-tablecer las clasificaciones impugnadas. Ello ocurre cuando la regulación o legislación impugnada establece diferencias en trato respecto a personas que pertenecen a una clase históricamente marginada o discriminada. La fun-ción nuestra debe ser evaluar con rigor las razones esgrimi-das para tales diferenciaciones.
En U.S. Dept. of Agric. v. Moreno, 413 U.S. 528 (1973), ese Tribunal invalidó una decisión del Congreso de Estados Unidos de excluir de los programas de cupones de alimen- *1054 tos a aquellos núcleos familiares que estuviesen compues-tos de personas no relacionadas sanguíneamente. El Tribunal analizó rigurosamente las justificaciones del Congreso y concluyó que mediante éstas se le negaban beneficios a familias necesitadas que de otra forma hubiesen recibido lo que reflejaba. íd., págs. 537-538 (“a bare congressional desire to harm a politically impopular group”).
En Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432 (1985), el Tribunal invalidó una ordenanza de la ciu-dad de Cleburne que, al aplicarse, denegaba un permiso especial para operar un asilo para personas con discapaci-dad mental. El Tribunal concluyó que no eran convincentes las razones expresadas por el Estado para justificar su or-denanza (Le., proteger a los habitantes de los posibles efec-tos de inundaciones; problemas de densidad poblacional en el área, etc.). Descartadas las justificaciones del Estado, sólo restaban: “mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding...”. íd., pág. 448.
Finalmente, en Romer v. Evans, 517 U.S. 620 (1996), el Tribunal declaró inconstitucional una enmienda a la Cons-titución de Colorado que prohibía cualquier protección a los homosexuales. El Tribunal Supremo catalogó esta me-dida como “sin precedentes”, e indicó que: “disqualification of a class of persons from the right to seek specific protection from the law is [a] status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests...”. íd., págs. 633-635. Específicamente, señaló el Tribunal: “ ‘[I]f the constitutional conception of “equal protection of the laws” means anything, it must at the very least mean that a bare... desire to harm a politically unpopular group cannot constitute a legitimate governmental interest”. (Enfasis en el original). íd., pág. 634.
En estos tres casos, el Tribunal Supremo federal tuvo ante su consideración una controversia de violación a la *1055 cláusula de igual protección de las leyes. En todas ellas el Tribunal rehusó crear una nueva clasificación sospechosa, así como también se negó a aplicar el escrutinio racional en su forma minimalista. Más bien, consideró, como adelanta-mos, que por estar involucradas minorías tradicionalmente discriminadas, era necesario evaluar no tan sólo la carga impuesta sobre éstas por la clasificación establecida, sino también las suficiencias o insuficiencias de las razones es-bozadas para establecerlas. El resultado fue la invalida-ción de las clasificaciones objetadas.
El Tribunal enfatizó en los patrones históricos de discri-men a los que los grupos afectados por la legislación im-pugnada habían estado sometidos, más allá que atenerse rigurosamente a uno u otro esquema de análisis constitu-cional tradicional. Hecho esto, concluyó que lo que “expli-caba” el trato diferenciado era, precisamente, el subya-cente discrimen histórico a que había estado sometido el grupo discriminado, a saber: los pobres, las mujeres y los homosexuales.
B
Recientemente, el Tribunal de Apelaciones de Estados Unidos para el Primer Circuito utilizó este análisis al con-siderar, y eventualmente invalidar, la See 3 del Defense of Marriage Act (DOMA, por sus siglas en inglés). Véase Commonwealth of Massachusetts v. United States Department of Health and Human Services, et al., slip op., No. 10-2204, May 31, 2012. La Sec. 3 del DOMA le negaba a las parejas del mismo sexo, casadas según leyes estatales que permitían su matrimonio, una serie de beneficios concedi-dos a los matrimonios heterosexuales en el ámbito federal.
El Tribunal concluyó que las cargas impuestas por el estatuto sobre las parejas del mismo sexo eran compara-bles a las cargas impuestas en Moreno, Cleburne, y Romer, *1056 las cuales el Tribunal Supremo catalogó como sustanciales, por lo que concluyó que eran inconstitucionales. Además, las justificaciones para éstas eran insuficientes y enmasca-raban un solapado discrimen. Commonwealth of Massachusetts v. United States Department of Health and Human Serviceset al., supra.
Por otro lado, más recientemente, el Tribunal de Apela-ciones de Estados Unidos para el Segundo Circuito tam-bién atendió una controversia que impugnaba la legalidad de la See. 3 del DOMA. En Windsor v. United States, 699 F.3d 169 (2d Cir. 2012), cert. granted, Docket no. 12-307, December 7, 2012, el Segundo Circuito aplicó el escrutinio intermedio al determinar que el discrimen por orientación sexual contra parejas del mismo sexo es una clasificación cuasisospechosa, según los criterios adoptados por el Tribunal Supremo federal en Bowen v. Gilliard, 483 U.S. 587 (1987). El tribunal apelativo concluyó:
A) homosexuals as a group have historically endured persecution and discrimination; B) homosexuality has no relation to aptitude or ability to contribute to society; C) homosexuals are a discernible group with non-obvious distinguishing characteristics, especially in the subset of those who enter same-sex marriage and D) the class remains a politically weakened minority. Windsor v. United States, supra, págs. 181-182.
Una vez el foro federal determinó que la legislación es-tablecía una clasificación por orientación sexual, concluyó que ésta constituye una clasificación cuasisospechosa que requiere aplicar el escrutinio intermedio para probar que esa clasificación está sustancialmente relacionada a un in-terés gubernamental importante. Evaluando las cuatro ra-zones principales para la redacción de DOMA — (1) mante-ner una definición uniforme sobre el matrimonio; (2) protección del fisco; (3) preservar el entendimiento tradi-cional sobre el matrimonio, y (4) promover la procreación responsable — , concluyó que el DOMA no se encuentra sus-tancialmente relacionado con ninguno de estos intereses *1057 gubernamentales y, por lo tanto, es inconstitucional por violar la igual protección de las leyes.
Vemos, entonces, cómo los tribunales federales han sido particularmente cuidadosos cuando se trata de diferencia-ciones establecidas que afectan a aquellas minorías que históricamente han sufrido discriminación. En estos casos, el Tribunal Supremo federal, aun aplicando el estándar más laxo de revisión, ha escudriñado con rigor las justifi-caciones del legislador y no ha vacilado en descartarlas cuando éstas han sido insuficientes. También, tribunales apelativos a nivel federal han actuado de esta forma o han concluido afirmativamente que se trata de una clasifica-ción cuasisospechosa que amerita una revisión más acuciante.
IX
A
La peticionaria afirma que erró el Tribunal de Apelacio-nes al no aplicar la figura de la adopción por el segundo padre o madre funcional para salvar la constitucionalidad de las disposiciones legales que regulan la figura de la adopción. Además, señala que no se consideró el mejor in-terés y bienestar de la menor al denegar la petición de adopción.
La determinación que hace la mayoría de este Tribunal sobre este asunto está predicada en el error de concluir que AAR incumple con los requisitos establecidos por el Código Civil para poder adoptar por ser del mismo sexo que la madre de la menor. La mayoría expresa que los requisitos para la adopción son de carácter jurisdiccional, por lo que el incumplimiento con alguno de ellos priva al Tribunal de autoridad para intervenir en la petición de adopción. Esta *1058 conclusión es errada.(45) AAR cumple con todos los requisi-tos exigidos por el Código Civil. Ella ha residido ininte-rrumpidamente en Puerto Rico, es mayor de edad, tiene capacidad jurídica para actuar y tiene por lo menos catorce años más que JMAV.
Es evidente que la orientación sexual heterosexual de una persona no es un requisito manifiesto para adoptar. Es por ello que un homosexual puede adoptar a un menor de edad individualmente. La orientación sexual del adoptante sólo incide en los efectos que tiene un decreto final y firme de adopción; ello, cuando el adoptante es del mismo sexo del padre o de la madre biológico del menor adoptado. En *1059 estos casos, como sabemos, es ese padre biológico quien soporta la pérdida del vínculo jurídico con el adoptado. Queda claro que la orientación sexual del adoptante no forma parte de los requisitos con los cuales hay que cum-plir para adoptar a un menor de edad. Toda pretensión en contrario no se justifica jurídicamente. Es por ello que, en principio, la razón esgrimida por la mayoría para negarse a adoptar la figura del segundo padre o madre funcional es errónea y sólo sirve de pretexto para no abordar el tema de la adopción por un segundo padre o madre funcional.
Ya indicamos que el principio rector para conceder o de-negar una petición de adopción es el mejor interés y bien-estar de la persona menor adoptada. Asimismo, los estatu-tos de adopción se deben interpretar liberalmente y siempre a favor del menor y su bienestar. En esta enco-mienda de adjudicación, la discreción judicial se traduce en una herramienta fundamental para enfrentar las contro-versias suscitadas en una sociedad en constante cambio.
Urge que calcemos los zapatos de la justicia y atendamos la adopción de JMAV procurando su mejor interés y bien-estar, a la misma vez que nos despojamos de preconcepcio-nes y visiones estereotipadas sobre cuál es el modelo de fa-milia que preferimos. Tenemos ante nuestra consideración un problema jurídico, mas no moral ni religioso.
Incorporar a nuestro ordenamiento la figura del se-gundo padre funcional nos permite proveerle a JMVA la protección de quien ha sido, desde siempre, una de sus madres. Igualmente, evitamos que JMVA pierda su rela-ción de filiación biológica con su otra madre. JMAV tiene dos madres y es nuestro deber reconocerle su filiación, ga-rantizándole con ello los derechos que de allí dimanan. De la documentación que consta en autos, esta conclusión es la más sensata. JMAV tiene una relación de amor con sus madres y las familias de ambas. Es deseable y saludable para su bienestar y desarrollo continuar con esa relación sin afectar los lazos maternos entre JMAV y CW. Para *1060 ello, entonces, procedía que se incorporara en nuestro or-denamiento la figura del segundo padre o madre funcional. Así evitaríamos cualquier efecto nocivo que pueda producir el cercenar los lazos biológicos entre madre e hija.
De los autos del caso se deduce que JMAV es una niña con un desarrollo intelectual muy superior en comparación con su grupo normativo. En la evaluación psicométrica que se le realizó se recomienda una escuela con alto nivel de exigencias académicas. El informe pericial demostró tam-bién que no existe riesgo alguno para JMAV dentro de su núcleo familiar. Más aún, allí se establece que el núcleo familiar cumple con las expectativas clínicas en cuanto al mejor interés y bienestar de JMAV.
Asimismo, el seno familiar donde crece y se desarrolla JMAV cumple con todos los criterios que guían la discre-ción del juez al considerar acceder o denegar una petición de adopción. JMAV es feliz junto a sus madres, tanto las madres como la hija presentan excelente salud física y mental, y ambas madres le brindan cariño y amor, satisfa-ciendo así las necesidades afectuosas, morales y económi-cas de la niña. JMAV está completamente adaptada a su hogar y comunidad, tanto es así que en los informes psico-lógicos se establece que está preparada para enfrentar el proceso de adopción. Igualmente, el desempeño escolar de JMAV es excelente.
Si AAR fuera una mujer heterosexual, no habría impe-dimento alguno para que adoptara la hija de su pareja afectiva. El impedimento surge, precisamente, porque no lo es. Por lo anterior, incorporaría la figura de segunda madre funcional y daría paso a la adopción de JMAV sin que CW soportara la pérdida de su condición de madre de la menor.
*1061 B
i
La mayoría del Tribunal, una vez descarta la figura de la adopción por el segundo padre o madre funcional, pasa a considerar el argumento constitucional y concluye que el Art. 138 del Código Civil no adolece de defecto alguno por-que no establece una clasificación sospechosa. Para ello, busca apoyo en el contenido del vocablo sexo, según se “fijó” en la Constitución, para concluir que no incluye género ni orientación sexual.
Como se indicó previamente, la metodología de la mayo-ría es errónea porque no apura adecuadamente cuál fue el mandato constitucional respecto el alcance de las protec-ciones constitucionales reconocidas en nuestra Norma Fundamental. Así que, el Tribunal, no tan sólo interpreta mal el texto sino, más grave aún, no capta el verdadero alcance de su función revisora, según ordenado por los pro-pios constituyentes. En este proceso, el dictamen mayorita-rio obvia toda discusión del escrutinio que debe aplicar en este caso, el intermedio, por tratarse de una clasificación que afecta a personas que pertenecen a grupos que han sido objeto de discrimen histórico y que incide, perniciosa-mente, sobre intereses individuales importantes.
Además, en su análisis, la mayoría, aun al aplicar el escrutinio de nexo racional, ignora toda discusión de la trilogía de casos Moreno, Cleburne y Romer, del Tribunal Supremo de Estados Unidos, donde ese tribunal, aun apli-cando el escrutinio laxo, escudriña con rigor las justificaciones esgrimidas por el legislador al establecer clasificaciones que afectan a minorías históricamente discriminadas. No debe sorprender, entonces, el errado dic-tamen mayoritario en el caso de autos.
*1062 Ü
Sabemos que uno de los grupos minoritarios tradicional-mente discriminados son los homosexuales y las lesbianas. En Puerto Rico, el discrimen y los prejuicios que sufren está documentado en un estudio realizado por la Comisión de Derechos Civiles de Puerto Rico. J. Toro Alfonso, Por vía de la exclusión: homofobia y ciudadanía en Puerto Rico, Comisión de Derechos Civiles, Estado Libre Asociado de Puerto Rico, 2007, pág. 82.(46) En ese trabajo se evidenció el alto nivel de exclusión social y discrimen institucionalizado relacionado con la comunidad homosexual. El estudio re-vela que hay una enorme resistencia de “las instituciones sociales en Puerto Rico... a los cambios sociales y a la acep-tación de la diversidad y complejidad de las relaciones humanas”. Id.
Igualmente, se señala en el informe que, lamentable-mente, el “sistema judicial aporta muy poco para detener la desencadenada homofobia en la sociedad”. Toro Alfonso, op. cit., pág. 82. Los participantes en el estudio informan que “la adhesión a los cánones tradicionales de la represen-tación social de género es un requisito importante para la inclusión social en Puerto Rico”. Íd. Véase, además, J. Toro-Alfonso y N. Varas-Díaz, Los otros: prejuicio y distancia social hacia hombres gay y lesbianas en una muestra de estudiantes de nivel universitario, 4 Revista Internacional de Psicología Clínica y de la Salud 537 (2004).
Recordemos, también, que la homosexualidad permane-ció tipificada en nuestro Código Penal hasta el 2004, cuando el Tribunal Supremo federal declaró inconstitucio-nal ese delito. Lawrence v. Texas, 539 U.S. 558 (2003). J. Toro Alfonso, Reflexiones en torno a la Sexualidad y el Género, ed. autor, Guatemala, F & G Editores, 2007 (http:// *1063 www.fygeditores.com/imagenes/sexualidad/Introduccion .pdf).
Es importante recordar que a mediados del siglo XX, la Asociación Psiquiátrica Americana (APA) incluyó la homo-sexualidad en su primer Manual de Diagnóstico como un desorden socipático de la personalidad. Posteriormente, en 1968, se reclasificó para incluirse como una desviación sexual, junto al fetichismo, la pedofilia y el exhibicionismo. No fue hasta 1973 que se eliminó parcialmente del Manual de Diagnóstico y hasta 1987 que fue totalmente eliminada. Véase Toro Alfonso, Masculinidades subordinadas, op. cit. Lo anterior evidencia los prejuicios subyacentes a la mar-ginalización de otras conductas sexuales diferentes a la heterosexualidad.
Los prejuicios sobre las personas homosexuales tienen su origen, entre otras razones, en la creencia de que la conducta homosexual es inmoral.(47) Véase Lawrence v. Texas, supra, pág. 571. Esta creencia, como bien señala el Tribunal Supremo federal, ha sido moldeada por las creen-cias religiosas, las concepciones sobre los comportamientos aceptados y la valoración de la llamada “familia tradicional”. íd. El Tribunal Supremo de Estados Unidos, a pesar de reconocer la fuerza que tienen estas creencias en la sociedad norteamericana, se preguntó si era correcto uti-lizar el Derecho para imponer sus valores sobre el resto de la sociedad. La respuesta fue concisa: “Our obligation is to define the liberty of all, not to mandate our own moral code”. Íd.(48)
*1064 Ante las nociones subyacentes de prejuicios y estereoti-pos bajo el discrimen histórico de orientación sexual, urge que despojemos las propias visiones morales del ejercicio judicial. Resulta impostergable que esta Curia reconozca las prácticas discriminatorias e inicuas contra grupos his-tóricamente perseguidos y políticamente marginados, y asuma el deber de dar la protección judicial y constitucio-nal para la que hemos sido investidos. Es hora de que este Tribunal, como elemento integral que opera en el desarro-llo del Derecho en Puerto Rico, acepte uno de los retos identificados que subyacen en nuestro Estado de Derecho:
En la medida en que las sociedades se tornan más heterogé-neas y pluralistas, se hace más patente la urgencia de repen-sar el derecho y el estado para convertirlos en entes facilita-dores de los proyectos de vida de cada cual y de cada grupo, sin imposiciones indebidas, con el mayor respeto a las diferencias y las necesidades particularizadas de grupos y personas, pero a la vez con la capacidad de generar mediante acción positiva las condiciones materiales y culturales requeridas para que esos proyectos de vida se realicen equitativamente para todos y todas. Rivera Ramos, supra, págs. 1125-1126.
iii
El historial legislativo de la Ley Núm. 8 de 19 de enero de 1995 no refleja razón alguna que explique, y mucho me-nos justifique, dar por terminado el vínculo jurídico maternal con la madre biológica de la adoptada cuando el adop-tante es del mismo sexo que la primera. En su comparecencia ante este Tribunal, el Estado señala que la razón para decretar el rompimiento del vínculo cuando el adoptante es del mismo sexo que el padre o madre que quiere mantenerlo era “proteger los valores arraigados en *1065 la institución de la familia como pilar fundamental de nuestra sociedad e impregnarle la más alta jerarquía al interés social que promueve el mejor bienestar del menor. Así pues, el Estado sólo puede encausar racionalmente es-tos legítimos intereses mediante la clasificación establecida”. (49)
¿Cuáles son los valores que se protegen al romperse los vínculos biológicos de la madre con su hija? ¿Se protegen de quién o de qué? ¿De qué familia se habla? La asevera-ción del Estado no nos dice nada, a la vez que nos dice mucho sobre el valor subyacente de imponer una visión moralista que perjudica intereses individuales importantes. Además, la justificación provista por el Es-tado para proteger el concepto de familia tradicional es incapaz de explicar por qué la propia ley faculta la adop-ción monoparental, independientemente de la preferencia sexual del adoptante, ajena al concepto de familia tradicio-nal que aparenta proteger el Estado.
La Opinión del Tribunal improvisa una justificación al señalar, sin fundamentación válida alguna, que el juicio legislativo fue sostener que “lo que se conoce como la fami-lia tradicional —padre, madre e hijos— [es] donde se pue-den sostener de manera más adecuada la estabilidad nece-saria para proteger efectivamente el mejor bienestar de los menores en Puerto Rico”.(50) Opinión del Tribunal, pág. 875. No obstante, no aporta ningún dato que justifique su razonamiento. Lo único que utiliza es un extracto de la Exposición de Motivos de la Ley Núm. 8 de 19 de enero de 1995 que, por cierto, está totalmente descontextualizado.
Es cierto que la Exposición de Motivos expone: “La ins-titución de la familia es el pilar principal de nuestra socie- *1066 dad, por lo tanto hay que brindarle [s] a esos niños la opor-tunidad de formar parte de un seno familiar”. Id. Ahora bien, dicha expresión no es parte de la justificación detrás del Art. 138 del Código Civil, sino que es un argumento excesivamente generalizado dirigido al interés de reformar la institución de la adopción para “reducir dramáticamente la cantidad de niños abandonados y desamparados, que va en escala ascendente en la Isla”. Exposición de Motivos de la Ley Núm. 8, supra. Omitir o descarrilar el contexto de una enunciación como ésta para crear la apariencia de algo no dicho, resulta altamente preocupante.
Además, si fuera correcta la explicación que se esgrime desde el estrado, de que la Asamblea Legislativa estatuyó como política pública sólo la “familia tradicional —padre, madre e hijos — ”, ¿cómo explicar que si CW hubiese es-tado dispuesta a perder sus vínculos biológicos con su hija, la ley no impedía que AAR adoptara sola a JMAV, sin cons-tituir esa realidad familiar una “familia tradicional —padre, madre e hijos — ”?(51)
Tratándose la controversia de autos de un discrimen por orientación sexual, donde las personas afectadas tienen un interés individual importante, pertenecen a un grupo social históricamente marginado y son acreedoras de una protección constitucional de mayor rigor que la aplicación *1067 de un escrutinio tradicional, como hemos demostrado, el interés gubernamental no se puede sostener en generaliza-ciones amplias. Véase United States v. Virginia, 518 U.S. 515, 533 (1996).(52) Además, por tratarse de una controver-sia donde aplica un escrutinio intermedio, la falta de justi-ficación plausible por parte del Estado sobre las razones que propiciaron la redacción del Art. 138 del Código Civil no se puede sustituir por la inventiva creativa de la Opi-nión del Tribunal. íd. (“The burden of justification is demanding and it rests entirely on the State”). La mayoría, evidentemente, incidió al sustituir la función de quien ve-nía obligado a mostrar un interés importante.
A pesar de errar al enunciar un interés gubernamental no provisto plausiblemente por el Estado, como quiera la justificación esgrimida por el Tribunal encierra, en reali-dad, una desaprobación moral sobre la familia constituida por dos personas del mismo sexo. Esta desaprobación, por sí sola, sin embargo, no puede justificar legislación que dis-crimine por orientación sexual. Véase Commonwealth of Massachusetts v. United States Department of Health and Human Services, et al., supra.
Finalmente, el Estado no da explicación que nos ubique en posición de ponderar el interés importante que tuvo para negar que una persona adoptante adopte al vástago *1068 de su pareja si esa persona es del mismo sexo que el padre o la madre del menor.(53) Mucho menos nos coloca en posi-ción de evaluar si hay una relación sustancial entre el in-terés no verbalizado y la clasificación cuasisospechosa del discrimen por orientación sexual. Tal ausencia claramente demuestra actitudes negativas y discriminatorias por parte del Estado contra grupos políticamente marginados.
Por ello, y en ánimo de salvaguardar el principio de se-paración de poderes que defiende la Opinión del Tribunal, ante una controversia de discrimen por orientación sexual donde están afectados intereses individuales importantes y aplica un escrutinio de mayor rigor que el tradicional, no le compete a esta Curia elaborar, crear o acuñar las razones y justificaciones que tuvo el Estado para discriminar contra personas históricamente marginadas. Tal función le co-rrespondía exclusivamente a la rama de gobierno llamada a defender la constitucionalidad del Art. 138. Ante el vacío justificativo del Estado, sí es función de este Tribunal cues-tionar el proceder legislativo que sea contrario a los prin-cipios de nuestra Constitución. Cf. Opinión del Tribunal, acápite V.D.
La carencia de justificación razonable de parte de la Asamblea Legislativa y del Procurador General nos lleva a concluir que la clasificación establecida por el Art. 138 del Código Civil está basada en prejuicios infundados y en creencias arcaicas sobre los homosexuales que conviven en *1069 una comunidad de afectos. Esta disposición es inconstitu-cional por violar el derecho a la dignidad humana y el prin-cipio de igualdad ante la ley.
X
El jurista español Juan Vallet de Goytisolo expresó que “[e]l Derecho no puede llevar a un resultado absurdo ni a un resultado injusto y debemos convencernos de que cuando nos lleva a este resultado es porque hemos seguido un camino equivocado, porque hemos errado en nuestros razonamientos”. J. Vallet de Goytisolo, Panorama del Derecho Civil, 2da ed., Barcelona, Ed. Bosch, 1973, pág. 86. En la controversia que tenemos ante nuestra considera-ción, la mayoría del Tribunal hace abstracción de los prin-cipios básicos del Derecho, llegando así al resultado injusto y absurdo que comenta el jurista español. Llevados por consideraciones extrajurídicas que no encuentran base en nuestro sistema de derecho, la mayoría se resiste a incor-porar una figura jurídica que estamos capacitados para adoptar con tal de preservar la expresión de política pú-blica que estatuyó la Asamblea Legislativa mediante las disposiciones de nuestra ley de adopción.
Ante tal rechazo, la mayoría del Tribunal refugia su vi-sión personal tras un análisis constitucional que se distan-cia del devenir social encauzado hacia la protección de gru-pos política e históricamente discriminados. Este Tribunal se niega a ejercer su función de reconocer, tal cual nuestros constituyentes nos orientaron, un campo semántico amplio y adaptativo detrás de las protecciones constitucionales enumeradas. Ante el escenario de discrimen en el texto legal sobre adopción que está ante nuestra consideración, nos compete ofrecer en remedio el poder colocar a AAR en la posición que ocuparía en ausencia de tal discrimen. Véase United States v. Virginia, supra, pág. 547. Lástima que la mayoría no fuera capaz de ofrecer un remedio como *1070 ese, que enaltece la dignidad humana de las personas afec-tadas en esta controversia!
Es lamentable que esta Curia sea incapaz de ver y reco-nocer el acto de desigualdad e injusticia jurídica en que incurre; a su vez, que sea incapaz de "cerrar la brecha en-tre derecho y realidad..Alvarez González, op. cit., pág. 2. La verdad es que, desde su nacimiento, JMAV convive con AAR y CW, quienes comparten con respecto a ésta, y en igualdad, las tareas cotidianas ínsitas a la crianza de los hijos. Correspondería ahora la configuración jurídica de esa realidad, a lo que, penosamente, se ha rehusado la ma-yoría de los miembros de este Tribunal por vivir enajena-dos y aislados de la realidad social, perpetuando y alen-tando con su proceder el discrimen histórico a que han estado sometidos los homosexuales y las lesbianas en nues-tro País.
Independientemente del sentir mayoritario, la realidad es que AAR ha fungido como madre de JMAV desde antes de ésta nacer y el expediente en este caso apunta a que, desde entonces, su norte siempre ha sido vigilar y defender el mejor interés de su hija. Lo que ha hecho, dicho sea de paso, con entereza, dignidad, sensibilidad y profundo amor maternal, amor que le es reciprocado por JMAV No hay razón ni en Justicia ni en Derecho para que este Tribunal se niegue a reconocer esa verdad y no convalide, jurídica-mente, lo que ya es realidad entre ellas: que AAR es y seguirá siendo madre de JMAV Ahí yace el mejor interés de la menor.
Por las razones expresadas y con profundo pesar, disiento desde el lado correcto de la historia y sin olvidar que “[l]a experiencia enseña que todo el que camina por la his-toria exhibiendo absolutos deja un mal recuerdo”.(54)
*1071 — O —

 Á. Darío Carrero, Inquietud de la huella: Las monedas místicas de Angelus Silesius, Madrid, Ed. Trotta, 2012, pág. 249.

 La Opinión de conformidad del Juez Asociado Señor Rivera García comenta sobre nuestra utilización del término palimpsesto y concluye que nuestra intención es borrar el texto constitucional para escribir otro. Para ello, el Juez selecciona con-venientemente la acepción del Diccionario de la Real Academia Española que más se ajusta a su propósito. Además, soslaya por completo la utilización intelectual del término palimpsesto dentro de las corrientes teóricas de interpretación de textos y la semiología. El mismo diccionario usado por el Juez señala, en su primera acepción del vocablo, que un palimpsesto es un manuscrito “que conserva huellas de una escritura anterior borrada artificialmente”. (Enfasis suplido). Diccionario de la lengua española, 22da ed., Madrid, Ed, Espasa-Calpe, 2001, T. II, pág. 1655.
Como bien señala esta definición, y tal como la utilizan los teóricos en la inter-pretación de textos, el palimpsesto es la acumulación de textos y significados en un mismo texto, sin borrar las grafías ni los significados de los textos anteriores. Por consiguiente, el palimpsesto significativo al que aludimos es a la acumulación poli sémica del texto constitucional, sin borrar los significados previos, como producto del devenir social. Para más información al respecto, sugiero la lectura de: R. Barthes, El grado cero de la escritura (N. Rosa trad., Siglo XXI Editores, 2003) (1953) (“las *1002 palabras tienen una memoria segunda que se prolonga misteriosamente en medio de las significaciones nuevas”, pág. 24); G. Genette, Palimpsests: Literature in the Second Degree (C. Newman y C. Doubinsky, trads.), University of Nebraska Press, 1997; (1982); J.L. Borges, Pierre Menard, autor del Quijote, en Ficciones, Buenos Aires, Editorial Sur, 1944.

 Nos sorprende sobremanera que algunos miembros de esta Curia adopten lo que la Opinión del Tribunal resuelve hoy, máxime cuando anteriormente se han expresado en términos de contribuir a este Foro con el dinamismo que los cambios sociales requieren. Hacia ese norte se dirigió la ponencia del Juez Asociado Señor Rivera García en su ceremonia de juramentación:
“Soy partícipe de la visión que la justicia comprende, no sólo aplicar estricta-mente los estatutos jurídicos a las controversias presentadas ante el foro judicial. También exige que el juez sea hacedor de la ley, negando sus propios impulsos para seguir la verdad. Requiere firme compromiso e integridad, es decir, el juez debe desvincularse de todas las razones ajenas a la búsqueda de la justicia en esa finalidad. Es imperativo que el juzgador no se desprenda del contexto social, econó-mico y cultural al momento de desempeñar su delicada función judicial. Desde la vertiente sociológica del Derecho, el juez en su calidad de intérprete de la ley para una comunidad, suple necesariamente omisiones, aclara ambigüedades y, si se atiende a los expositores del derecho libre, armoniza la ley con la justicia. En armo-nía con esa visión, la función de este Tribunal debe estar revestida de continuo dina-mismo para enfrentar las complejas controversias que inciden sobre él ordenamiento social.
*1003 “Puerto Rico nos exige responder con firme voluntad a los vertiginosos cambios que experimentamos. Es ineludible descargar la función normativa de forma creatival,] justa y con atención a los reclamos de la ciudadanía”. (Enfasis nuestro). Ceremonia Jur. Juez Rivera García, 179 D.P.R. ix, xvii-xviii (2010).
Al comentar sobre el “common law”, el Juez se expresó para que “en la inter-pretación de los estatutos se recojan los cambios sociales emergentes”. (Enfasis nuestro). Id., pág. xix. Más adelante concluyó: “Es preciso recordar que vivimos en tiempos de cambio y haciendo eco de expresiones del reconocido jurista, el juez Ben-jamín Cardozo: ‘la causa y el fin del derecho es promover el bienestar social’ ”. Id., pág. xx. Es una lástima que el compañero Juez Asociado haya olvidado tan rápida-mente sus expresiones, emitidas el 8 de septiembre de 2010, apenas dos años y cinco meses atrás.

 El Art. 138 del Código Civil dispone:
“No obstante lo dispuesto en [el Art. 137] de este título, los vínculos jurídicos del adoptado con su familia paterna o materna anterior subsistirán cuando el adoptado sea hijo del cónyuge del adoptante, aunque el padre o madre hubiere fallecido a la fecha de presentación de la petición de adopción, o cuando el adoptado proviene de una única filiación y es adoptado por persona de distinto sexo al del padre o madre que lo ha reconocido como su hijo”. (Enfasis nuestro). 31 L.P.R.A. sec. 539.

 Adoptamos aquí el término adopción por el segundo padre o la segunda ma-dre funcional como equivalente a second parent adoption. Acogemos la definición propuesta por la Clínica de Sexualidad y Género de la Escuela de Derecho de la Universidad de Columbia, que sostiene que un padre o madre funcional es un adulto que está criando a un menor junto a su pareja del mismo sexo, sin protección legal para esa relación de padre/madre hijo. De igual manera, utilizaremos el término familia funcional para describir aquellas familias en las que un padre o una madre es reconocida legalmente a través de una relación biológica o adoptiva con el menor, mientras que la otra madre, la madre funcional, no lo es. Citando a M. Minow, Redefining Families: Who’s In and Who’s Out?, 63 (Núm. 2) U. Colo. L. Rev. 269, 270 (1991), y a J. Millbank, The Role of “Functional Family” in Same-Sex Family Recognition Trends, 20 (Núm. 2) Child & Fam. L.Q. 155 (2008).

 Nótese que en este tipo de procedimiento se utilizan las iniciales de los sujetos involucrados para proteger su identidad y la confidencialidad de los procesos. Lo anterior contraviene irrefutablemente la afirmación de la mayoría en cuanto a que “[a]l comparecer a un tribunal para comenzar un procedimiento de adopción fue la propia peticionaria la que abrió las puertas de su hogar al foco público”. (Enfasis suprimido). Opinión del Tribunal, pág. 879. La aseveración de la mayoría es equivo-cada y contraria a derecho, además que supone que cualquier comparecencia a un foro judicial representa la anuencia a convertir público el asunto. A esto, nos pregun-tamos: ¿De qué otra forma se pueden reclamar derechos constitucionales si no es acudiendo al Tribunal? ¿Acaso no existen mecanismos procesales para mantener fuera del ojo público aquellos asuntos de alto interés donde se quieren proteger ciertos valores? ¿Qué propone la mayoría?

 Si bien en su alegato la parte peticionaria invocó la figura de la adopción sucesiva, preferimos reservar ese término para aquellos casos en los que quien adopte sea el cónyuge de la madre o del padre biológico.

 El Tribunal de Apelaciones llega a igual conclusión. No compartimos el cri-terio de estos foros. No hay duda de que la validez constitucional de las disposiciones sobre adopción del Código Civil fue un asunto que las partes discutieron en los foros inferiores. Tal es así, que esta discusión ocupa gran parte de la argumentación del Estado en su comparecencia original para oponerse a la solicitud de adopción. Lo que ha hecho la peticionaria, con correcto rigor jurídico, es plantear este asunto como un argumento residual. Su argumentación con respecto a la adopción por el segundo padre o segunda madre funcional está enmarcada, precisamente, en ofrecer una alternativa a declarar inválidas, por ser constitucionalmente defectuosas, las dispo-siciones de adopción del Código Civil.

 En Delgado, Ex parte, 165 D.P.R. 170 (2005), el Tribunal se limitó a interpre-tar el texto de la Ley del Registro Demográfico de Puerto Rico. Es jurídicamente incorrecto extrapolar ese dictamen como fundamento para rechazar la solicitud en este caso, y es irrelevante a la controversia ante nuestra consideración porque los intereses tutelados en ambos casos son completamente diferentes. La Ley del Regis-tro Demográfico, a diferencia del estatuto que regula la institución de la adopción, en ningún momento nos ordena atender, sobre cualquier otra consideración, el mejor interés y bienestar de la persona que solicita el cambio en el Registro Demográfico.
*1008 También, es necesario resaltar que en Delgado, Ex parte no se presentaron plan-teamientos constitucionales para sustentar el reclamo de la peticionaria ante esta Curia. Precisamente con ello coincidió la mayoría de los Jueces que se mostraron conformes con la Opinión del Tribunal. Se indicó, además, que aún el error planteado no se discutió “con rigurosidad jurídica”. Id., pág. 179 esc. 4. Más aún, expresamos que “[l]a discusión del error se da sin acopio alguno de las razones que la fundamen-tan en derecho ni las autoridades que lo apoyan”. Id. Véase, también, Knox v. SEIU, 132 S.Ct. 2277, 2299 (2012) (Op. Conc. Sotomayor, J.) (donde la Juez Sotomayor ciútica la resolución de un asunto no planteado ante el Tribunal Supremo federal, al decir: “To do so, as the majority does, on our own invitation and without adversarial presentation is both unfair and unwise. It deprives the parties and potential amici of the opportunity to brief and argue the question”).
En este sentido, la controversia de autos se diferencia radicalmente de Delgado, Ex parte, ya que la peticionaria en este caso presentó dos planteamientos alternati-vos: el primero, dirigido a resolver la controversia sin tener que entrar en argumen-tos constitucionales incorporando en nuestra jurisdicción la doctrina del second parent adoption, y el segundo, de no ser posible el primero, presentó varios argumentos constitucionales, entre ellos el de igual protección de las leyes.

 Somos conscientes de que las opiniones y discusiones relacionadas con los profundos cambios experimentados por el derecho de familia han estado impregna-das de “gotas de subjetividad que dejan entrever las razones de orden moral e ideo-lógico que las fundamentan”. M.D. Bardají Gálvez, La orientación sexual como factor determinante de la idoneidad para adoptar, 2008 Rev. Der. Priv. 55, 56 (mayo-junio 2008). Ello, no obstante, consideramos que como juristas sólo nos corresponde acer-carnos a esta realidad ciñéndonos al campo estrictamente jurídico. Es decir, dejando a un lado las convicciones personales sobre cuál modelo normativo de familia debería prevalecer.
A fin de cuentas, “[los] argumentos morales o religiosos deben ser controvertidos con otros argumentos morales o religiosos, respecto a lo cual el mayor o menor peso de los unos o de los otros dependerá de la cosmovisión de cada individuo y su derecho al ejercicio de su libertad de opinión”. S. Estrada Vélez, Familia, matrimonio, adopción: algunas reflexiones en defensa del derecho de las parejas del mismo sexo a constituir familia y los menores a tenerla, Revista de Derecho, 36 Universidad del Norte 126, 136 (2011). Con lo cual son ajenos a la discusión sobre la naturaleza y alcance de una norma jurídica, los fundamentos de carácter religioso o moral. El *1010 Derecho orienta la libertad externa del ciudadano pero no cambia ni modifica la actitud interna donde reside la moralidad. Véase Javier Gomá Lanzón, Mi té con el presidente, 7 de diciembre de 2011, disponible en http://www.abc.es/20111207/ espana/abcp-presidente-20111207.html (última visita 27 noviembre de 2012).

 Joan Bestard, antropólogo social, señala que “[b]asta retroceder a los años setenta del siglo XX para comprobar que no reconocemos el ideal normativo que regía la familia nuclear con el acento en el patriarcalismo, la indisolubilidad del matrimonio y la autoridad indiscutible de los padres sobre los hijos. Este tipo de familia, que se consideraba como la mejor adaptación a la sociedad industrial, ha ido desapareciendo para dar lugar a modelos que ponen el acento en la autonomía individual y la igualdad de géneros, y que se basan en el sentimiento y el deseo, y en formas de autoridad constantemente dialogadas y negociadas”. J. Bestard, Nuevas formas de familia, Metrópolis, Revista d’Informació i pensament urbans, pág. 2.

 Desde el 2000 existe un consenso sobre la existencia de diversos tipos de arreglos familiares. Se entiende que, actualmente, la familia tradicional o nuclear sólo representa menos de una cuarta parte del total de las familias existentes. Véase R. Brent Drake, Nota, Status or Contract? A Comparative Analysis of Inheritance Rights Under Equitable Adoption and Domestic Partnership Doctrines, 39 Ga. L. Rev. 675, 678 (2004-2005). En esa misma línea, se comenta en un informe reciente del Movement Advancement Project, Family Equality Council y Center for American Progress, en asociación con COLAGE, Evan B. Donaldson Adoption Institute y el National Association of Social Workers, que se puede decir que de 2.0 a 2.8 millones de niños y niñas viven con padres de orientación sexual diferente a la heterosexual. Véase All Children Matter, pág. 7, disponible en http://www.lgbtmap.org/file/all-children-matter-full-report.pdf (última visita 13 de junio de 2012).

 E. y J. Goncourt, Pages from the Goncourt Journal, Nueva York, NYRB Classics, 2006.

 Sobre estos cambios se ha señalado lo siguiente:
“It is not the courts that have engendered the diverse composition of today’s families. It is the advancement of reproductive technologies and society’s recognition of alternative life styles that have produced families in which a biological, and therefore a legal, connection is no longer the sole organizing principle. But it is the courts that are required to define, declare and protect the rights of children raised in these families, usually upon their dissolution. At that point, courts are left to vindicate the public interest in the children’s financial support and emotional well-being by developing theories of parenthood, so that ‘legal strangers’ who are de facto parents may be awarded custody or visitation or reached for support... It is surely in the best interests of children, and the state, to facilitate adoptions in these circumstances so that legal rights and responsibilities may be determined now and any problems that arise later may be resolved within the recognized framework of domestic relations laws”. (Énfasis nuestro). Adoptions of BLVB and ELVB, 628 A.2d 1271, 1276 (Vt. 1993).

 El Código Civil de Luisiana de 1870 disponía, en su Art. 214:
“Any person may adopt another as his child, except those illegitimate children whom the law prohibits him from acknowledging; but such adoption shall not interfere with the rights of forced heirs.
*1016 “The person adopting must be at least forty years old and must be at least fifteen years older than the person adopted.
“The person adopted shall have all the rights of a legitimate child in the state of the person adopting him except as above stated.
“Married persons must concur in adopting a child. One of them cannot adopt without the consent of the other”.

 Véase, por ejemplo, el informe que rindiera la Comisión de lo Jurídico luego de haber estudiado y considerado el Proyecto de la Cámara Núm. 795. 2 (II) Diario de Sesiones de la Asamblea Legislativa 1291 (1953).

 El nuevo Art. 137 pasó a disponer así: “La adopción de una persona no será impedimento para que el adoptante pueda realizar otras adopciones”. 31 L.P.R.A. sec. 537.

 El Art. 138 del Código Civil, añadido mediante la Ley Núm. 8 de 19 de enero de 1995, 31 L.P.R.A. sec. 539, dispone que sí subsistirá el vínculo con la familia anterior del progenitor cuando la persona adoptada provenga de filiación única y la persona adoptante sea de sexo distinto al del progenitor. Sin embargo, el Historial Legislativo de la Ley Núm. 8 está huérfano de justificación para esta incorporación.

 Véase, e.g., Pérez, Román v. Proc. Esp. Rel. de Fam., 148 D.P.R. 201 (1999).

 Véase, e.g., Ex parte J.A.A., 104 D.P.R. 551 (1976). En ese caso se permitió a una mujer adoptar a la hija de su expareja, aunque no estuviesen casados entre sí, sin que se rompiera el vínculo jurídico con el padre biológico de la adoptada. Esto, contrario a lo dispuesto por el Artículo 133 del Código Civil vigente a la fecha de resolución del caso. 31 L.P.R.A. sec. 534. Esa situación de hechos y la solución pro-vista por este Tribunal se reconocieron en el Art. 138 del Código Civil, incorporado por la Ley Núm. 8 de 19 de enero de 1995.

 La Opinión del Tribunal cita a Rivera Coll v. Tribunal Superior, 103 D.P.R. 325, 331 (1975), para indicar que a pesar de que la interpretación de las normas sustantivas que regulan la adopción debe hacerse liberalmente a favor del adop-tando, tal interpretación no puede conducir a absurdos. Sin embargo, la Opinión descontextualiza por omisión lo que en tal caso concluimos que era un absurdo jurí-dico, pues lo absurdo en aquella situación de hechos era permitirle al adoptado he-redar en representación de su primer padre adoptivo cuando había sido adoptado por segunda ocasión. Entendimos, en esa ocasión, que si la adopción rompía todo vínculo jurídico con la familia biológica del adoptado, lo mismo debía suceder respecto a la primera adopción, en caso de darse una segunda.

 Se debe precisar que aun cuando consideramos que el Estado no debería emitir juicios morales sobre los arreglos familiares de la ciudadanía, las parejas heterosexuales siempre tienen la opción de contraer matrimonio y así adoptar al hijo o hija de su cónyuge. Sin embargo, dicha opción no está disponible en nuestra juris-dicción para las parejas del mismo sexo. Es importante aclarar que, la constitucio-nalidad del Defense of Marriage Act de 1996 (DOMA) que prohíbe conceder beneficios a las parejas casadas del mismo sexo, ya que define el matrimonio como la unión de un hombre y una mujer. Véase http://www.scotusblog.com/2011/02/u-s-says-doma-ban-invalid/; http://www.scotusblog.com/2011/08/what%e2%o%99s-rational-about-rational- basis-review/; http://www.scotusblog.com/2011/08/why-the-supreme-court-will-strike-down-doma/.

 Son múltiples los casos en relación con este tipo de adopción en la jurisdic-ción norteamericana. De acuerdo con esto, se pueden ver, por ejemplo: In the Matter of the Adoption of Infant K.S.P. and Infant J.P., 804 N.E.2d 1253 (Ind. 2004); Sharon v. The Superior Court of San Diego County, 73 P.3d 554 (2003); In re Adoption of R.B.F. and R.C.F, 803 A.2d 1195 (Pa. 2002); In re Hart, 806 A.2d 1179 (Del. 2001); In re Adoption of K.M., 653 N.E.2d 888 (Ill. 1995); In re M.M.D., 662 A.2d 837 (D.C.1995); Adoption of Tammy, 619 N.E.2d 315 (Mass. 1993); Adoption of B.L.V.B., 628 A.2d 1271 (Vt. 1993); In the Matter of Adoption of Two Children by H.N.R., 666 A.2d 535 (N.J. 1995); M.W. v. A.W. (In re Adoption of N.W.), 933 N.E.2d 909 (Ind. Ct. App. 2010).

 California, Colorado, Connecticut y Vermont reconocen actualmente, me-diante legislación, la figura del second parent adoption. Los siguientes tribunales apelativos han decidido que leyes estatales permiten el second parent adoption: el Distrito de Columbia, Illinois, Indiana, Massachusetts, Nueva York, Nueva Jersey y Pennsylvania. Los tribunales de instancia la han garantizado en Alabama, Alaska, Delaware, Hawaii, Iowa, Louisiana, Maryland, Michigan, Minnesota, Nevada, Nuevo México, Oregon, Rhode Island, Texas y Washington. Sólo los foros apelativos *1024 de Nebraska, Ohio y Wisconsin se han negado a reconocer la figura. No está claro o decidido en Arizona, Arkansas, Florida, Georgia, Idaho, Kansas, Kentucky, Maine, Mississippi, Missouri, Montana, Nuevo Hampshire, Carolina del Norte, Dakota del Norte, Oklahoma, Carolina del Sur, Dakota del Sur, Tennessee, Utah, Virginia, Virginia del Oeste y Wyoming. Disponible en http://www.proudparenting.com/node/ 949?page=I (último acceso 10 de diciembre de 2012). Véase, además, www.thetaskforce.org/reports_and_research/second_parent_adoption_law.

 Nótese que en los quince estados de Estados Unidos donde el matrimonio de personas del mismo sexo está permitido, la adopción sucesiva está disponible para éstos. En los otros treinta y cinco estados que no reconocen el matrimonio homosexual, la adopción por el segundo padre o madre funcional puede estar disponible para las parejas del mismo sexo aunque no se les permita casarse.

 Debe quedar claro que los niños y las niñas de parejas del mismo sexo no poseen los mismos derechos que los niños de las parejas heterosexuales. En ese sentido, los niños de las parejas casadas gozan de estabilidad familiar y seguridad económica derivada del vínculo legal entre su madre y su padre; los niños y niñas de las parejas del mismo sexo no. Véanse: M. Marzano-Lesnevich y G. Moskowitz, In the Interest of Children of Same-Sex Couples, 19 J. Am. Acad. Matrimonial Law 255 (2005); E. Zuckerman, Comentario, Second Parent Adoption for Lesbian-Parented Families: Legal Recognition of the Other Mother, 19 U.C. Davis L. Rev. 729 (1985-1986).

 El sistema republicano de gobierno, si bien incluye la división tripartita del poder, es mucho más que la separación de poderes. El sistema republicano de go-bierno busca, más que nada, la consecución del bien común y para ello utiliza herra-mientas como: la soberanía popular, la separación de poderes, la libertad y el estado de derecho o rule of law. Véase M.N.S. Sellers, Republican Legal Theory: The History, *1029 Constitution and Purposes of Law in a Free State, Nueva York, Palgrave Macmillan, 2003.

 Véase S.J. Brison y W. Sinnott-Armstrong, Contemporary Perspective on Constitutional Interpretation, Boulder, Westview Press, 1993, pág. 47.

 El desacierto de la invitación de la mayoría queda evidenciado con su pos-tura de que adoptamos el significado de “sexo” según discutido en la Convención Constituyente. Allí se sostuvo que el propósito de la prohibición de discrimen por razón de sexo “ ‘es reconocer el advenimiento de la mujer a la plenitud del derecho y a la igualdad de oportunidades con el hombre’ ”, (Énfasis suprimido). Opinión del Tribunal, pág. 865 (citando a 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico 2561 (1951)). Sin embargo, la Opinión omite parte de la cita. A renglón seguido de lo recogido por la mayoría, se indica lo siguiente: “Por otra parte no se trata aquí de cambiar, por ejemplo, la organización de la sociedad de gananciales porque en ella [le] corresponda al marido y no a la esposa la posición de administrador”. (Énfasis nuestro). Diario de Sesiones de la Convención Constitu-yente, pág. 2561. Para ser consistentes con esto último, suponemos que la mayoría debería resolver, en lo sucesivo, que las mujeres están subordinadas a los hombres, pues esa es la intención original del vocablo sexo.

 Disponible en http://www.tribunalconstitucional.es/es/jurisprudencia/ Paginas/ Sentencia.aspx?cod=20674.

 Consterna, por demás, que ante la evidente ausencia de argumentos jurídi-cos de la Opinión de conformidad del Juez Asociado Señor Rivera García, se recurra a aseveraciones que dejan entrever “las razones de orden moral e ideológico” que sostienen su particular cosmovisión de la familia y la dignidad del ser humano. En particular, causa desasosiego e intranquilidad que desde este Alto Foro y, por lo tanto, con el peso de esta Institución, se asevere que la estructura familiar de una niña con dos madres violenta la dignidad humana de la menor.
Ante la realidad fáetica de una familia que en la crianza de la menor revela un comportamiento ejemplarizante que es digno de emular, dato sustentado por el ex-pediente, y en donde JMAV reconoce y dice como parte de su identidad “yo tengo dos mamás” (Alegato de la peticionaria, pág. 3), las palabras del Juez Asociado Señor Rivera García reflejan intolerancia y rayan en la insensibilidad humana. Son, con todo respeto pero con firmeza, indignas de un miembro de esta Curia.

 Es por ello que es erróneo aferrarnos ciegamente en estos casos a las inter-pretaciones de la cláusula de igual protección de las leyes de la Constitución de Estados Unidos. La cláusula nuestra es más amplia y más rica que la de la Consti-tución estadounidense.

 Optar por una interpretación restringida en esta área, como hace la mayo-ría, es ir en contra del significado “original” de nuestra Constitución.

 El Segundo canon de interpretación que recoge el Art. II, Sec. 19 de la Constitución, L.P.R.A., Tomo 1, según el propio Jaime Benitez, sirve de contrapeso al primero en el sentido de lograr un balance entre la protección de los derechos del individuo y la protección de la vida, la salud y el bienestar del pueblo. La protección de los derechos constitucionales no se debe ver aisladamente, sino enmarcada dentro de la colectividad que representa la sociedad. Diario de Sesiones de la Convención Constituyente, supra, pág. 2576. Finalmente, el delegado Benitez hace un llamado a la armonización de intereses en conflicto, pues ello “constituye el arte supremo del gobierno”. íd.
Estas palabras, casi imperativamente, nos llevan a la conclusión de proscribir cualquier interpretación constitucional que desbalanceadamente le dé mayor crédito a una interpretación restrictiva del concepto familia que la Opinión del Tribunal impone como modelo emulativo. Dicho está en el Diario de Sesiones de la Convención Constituyente, que la deontología de este Tribunal supera y se inserta en una sen-sibilidad artística la formalidad de una racionalidad que conduce a aporías interpre-tativas de armonizar intereses encontrados de acuerdo con las exigencias del devenir social.

 Las distintas opiniones de la mayoría de esta Curia se sorprenden por nues-tra expresión de que interpretamos nuestra Constitución y no ninguna otra. Incluso resaltan una supuesta contradicción entre tal aseveración y nuestra utilización de sentencias de tribunales internacionales o hasta del uso de un estándar de revisión constitucional de escrutinio intermedio. Ante nimiedades, sólo basta decir que los niveles de escrutinio constitucional son estándares de revisión judicial, independien-temente del origen sustantivo del texto legal. La Constitución de Puerto Rico reco-noce la revisión judicial en el Art. V, Sec. 4, por lo que no es incompatible incorporar a nuestra función adjudicativa estándares teóricos de revisión judicial desarrollados por tribunales extranjeros, si estos estándares se ajustan al contenido sustantivo de nuestra Constitución.
Por último, ignoramos de dónde las distintas opiniones de la mayoría obtienen que utilizamos sentencias de tribunales extranjeros para definir el vocablo “sexo” de nuestra Constitución. La referencia a estos tribunales sólo abona a la visión del texto constitucional como un documento vivo, tal como la Opinión de conformidad del Juez Asociado Señor Martínez Torres cita a exponentes de la teoría del “originalismo”, como Antonin Scalia, para sustentar su visión personal y subjetiva de la función y metodología adjudicativa de los Jueces de este Tribunal.

 Es curioso que la Opinión del Tribunal recurre al “originalismo” como teoría interpretativa y en ningún momento acude al texto original que interpretamos, la Constitución del Estado Libre Asociado de Puerto Rico, ni a lo expresado sobre in-terpretación constitucional en el Diario de Sesiones de la Convención Constituyente para ver qué, si algo, nos dijeron los “originalistas” sobre cómo interpretar nuestra Carta Magna. Parecería más razonable, si se desea ser riguroso con la tesis que se postula, que la referida Opinión se expresara con relación al contenido de la Sec. 19 del Art. II de la Constitución y se confrontara con las expresiones del delegado Don Jaime Benitez y con lo expuesto por la Escuela de Administración Pública de la Universidad de Puerto Rico. Su silencio sobre este particular es elocuente. Al no hacerlo y meramente invocar una teoría en el vacío obviando los textos mencionados, no es irrazonable concluir que la teoría invocada sólo se adopta para justificar el resultado preconcebido que recoge su particular cosmovisión social.
*1037 Sobre este particular, es necesario destacar que al aferrarse a la descripción de la intención original del significado de sexo, la Opinión del Tribunal opta por no hacer un análisis integrado del resto de la Constitución y del Diario de Sesiones de la Convención Constituyente. Los miembros de la mayoría del Tribunal leen aislada-mente las disposiciones de estos dos textos y no miran ni analizan el conjunto o su totalidad, particularmente aquellas expresiones donde tanto la Constitución como el Diario de Sesiones nos ofrecen el canon interpretativo de las disposiciones constitu-cionales sobre los derechos protegidos de los ciudadanos. Véanse: Art. II, Sec. 19; Diario de Sesiones de la Convención Constituyente, págs. 2561 y 2576. La Opinión de conformidad del Juez Asociado Señor Martínez Torres es la única que atiende el texto de la Sec. 19 del Art. II de la Constitución, pero yerra en su interpretación sobre la función de este Tribunal ante la protección de derechos constitucionales. Obvia el Juez que la referida Sec. 19 faculta a la Rama Judicial, no para aprobar leyes, prerrogativa exclusiva de la Rama Legislativa, sino para reconocer derechos no enu-merados, máxime cuando no hacerlo viola disposiciones constitucionales de alto valor, como la dignidad del ser humano.

 La Opinión del Tribunal y dos Opiniones de conformidad cuestionan cuál es el “talismán” (Jueza Asociada Señora Pabón Charneco), “criterio moral” (Juez Aso-ciado Señor Martínez Torres) o “criterio rector” (Juez Asociado Señor Rivera García) que se debe utilizar para actualizar el significado de nuestra Constitución a la rea-lidad presente. Ante cuestionamientos que son reflejo de un profundo ensimisma-miento o enajenación social, debo señalar que las constituciones son producto de sucesos históricos que reflejan movimientos sociales. Por ello, y para no fosilizarse, nuestra Constitución se debe enfrentar al entorno social que rodea la actualidad, tal cual fuera la exigencia de los constituyentes a “ensanchar sus disposiciones para dar plena realización a lo [allí] dispuesto”. Diario de Sesiones de la Convención Consti-tuyente de Puerto Rico, pág. 2561.
Por esto, la adaptación del significado constitucional a la realidad presente no es producto de una visión personal, sino del reconocimiento del desarrollo de los derechos de parejas del mismo sexo a nivel mundial. Es la aceptación de que el mundo se dirige hacia una dirección y que nuestra Constitución se debe adaptar y ser fiel a la realidad social que estamos viendo y viviendo, con el ánimo de equiparar la realidad jurídica a la social.
Como muestra de lo anterior, véanse, por ejemplo, los adelantos en el reconoci-miento de derechos de parejas del mismo sexo en las enmiendas del 2002 al Libro Segundo del Código Civil de Quebec; la aprobación del derecho de adopción por pa-rejas del mismo sexo que efectuó la Suprema Corte de Justicia de la Nación de México en el 2010 (http://mexico.cnn.com/nacional/2010/08/16/Ia-suprema-corte-aprueba-el- derecho-de-adopcion-a-matrimonios-gay) así como de los matrimonios entre personas del mismo sexo (http://mexico.enn.com/nacional/2010/08/10/la-corte-mexicana-avala-la- validez-de-los-matrimonios-gay-en-todo-el-pais); la aprobación en el 2010 del Libro Segundo del Código Civil de Cataluña; la pronta aprobación en Francia de una ley sobre matrimonios entre parejas del mismo sexo y la adopción de menores por estas parejas (http://www.senat.fr/dossier-legislatif/pjll2-349.html); el Art. 44 del Código Civil español que permite el matrimonio entre personas del mismo sexo; la reciente validación por la Corte de Casación de Italia de la filiación adoptiva por parejas del mismo sexo (http://www.upi.com/Top_News/World-News/2013/01/12/ Italys-high-court-Gay- couples-may-adopt/UPI-72721358013006/); la validación de matrimonios de personas del mismo sexo y adopciones de niños por estas parejas en países como Bélgica, Países Bajos, Sudáfriea, Islandia, Argentina, Suecia, Noruega, entre otros (http://www.globalpost.com/dispatch/news/afp/130205/gay-marriage-across- the-world).
Además, véase el reconocimiento de estos matrimonios en estados de Estados Unidos, como Maine, Massachusetts, Nueva York, entre otros; reclamos judiciales en Estados Unidos, entre los que el Tribunal Supremo de ese país expidió autos de certiorari en Hollingsworth v. Perry, Docket No. 12-144, y Windsor v. United States, Docket No. 12-307; reconocimiento por líderes políticos de Estados Unidos, como el del Presidente Barack Obama (http://www.whitehouse.gov/the-press-office/2013/01/ 21/inaugural-address- president-barack-obama), y de Puerto Rico, como el del exgobernador Pedro Roselló González (http://www.noticel.com/noticia/136513/sin- *1039 titubeos-rossello-favorece-matrimonio-gay.html). Véase, también, http://www. elnuevodia.com/mnatieneunpadreydosmadreslegales-1444265.html (tribunal de Florida valida que una niña tenga un padre y dos madres legales, siendo éstas dos pareja).
Estos acontecimientos mundiales no deben minusvalorarse, pues nos proveen las coordenadas para saber dónde estamos posicionados en comparación con el resto de la sociedad. En palabras del Juez Asociado Anthony M. Kennedy: “The opinion of the world community, while not controlling our outcome, does provide respected and significant confirmation for our own conclusions”. Roper v. Simmons, 543 U.S. 551, 578 (2005).

 Es importante señalar que en Wackenhut rehusamos aplicar el examen judicial más minucioso que se aplica a las clasificaciones inherentemente sospechosas, puesto que la clasificación en aquella situación de hechos no “repugna[ba] a la con-ciencia por estar basada en prejuicios o motivaciones ilegítimos o por ser injusta”. Wackenhut Corp. v. Rodríguez Aponte, 100 D.P.R. 518, 530 (1972).

 Véase Com. de la Mujer v. Srio. de Justicia, 109 D.P.R. 715, 733 (1980) (“Es evidente que la legislatura ha actuado a base de meras conjeturas, prejuicios arcai-cos y nociones estereotipadas, con abstracción de las características verdaderas de los miembros del género femenino”).

 Informe de la Rama Judicial, pág. 19.

 Ante la negación de esta Curia a dar paso a la aplicación de un escrutinio intermedio so pretexto de que éste nunca se ha incorporado en nuestra jurisdicción, lo aplicable ante una situación de discrimen por razón de género debe ser el escru-tinio estricto, por ser el discrimen por razón de género una modalidad del discrimen por razón de sexo. Además, que tal discrimen merece una protección constitucional superior al escrutinio más laxo, con tal de evitar escenarios discriminatorios que acentúen la desigualdad entre hombres y mujeres.

 Contemporáneamente, también se habla de orientación sexual en el con-texto de la identidad de género y no sólo del sexo de la persona por la cual otra se siente atraída. En el caso de aquellas personas que pueden sentirse atraídas por otra, independientemente de su identidad de género, se habla de pansexualidad.

 Ante la renuencia exhibida por este Tribunal para aplicar un escrutinio intermedio en controversias como la de autos, con ánimo de seguir según el proceder tradicional de un análisis constitucional maniqueísta, la conclusión no podría ser otra que tomar el discrimen por orientación sexual como una clasificación sospechosa en sí misma que viola la dignidad de personas históricamente discriminadas, lo que indefectiblemente nos llevaría a la aplicación del escrutinio estricto. Además, la apli-cación de un escrutinio tradicional ante un discrimen por orientación sexual ofrece-lúa una protección de poca monta que sería incompatible con el derecho a la dignidad humana de grupos políticamente marginados.

 Me resulta peculiar la “discusión” del Juez Asociado Señor Rivera García respecto al “feminismo radical”, su “anti-intelectualidad” y la llamada “ideología de género”. Resulta peculiar porque, como sabemos, éste es un lenguaje utilizado por organizaciones fundamentalistas para desprestigiar y socavar la lucha por la igual-dad, por considerarla amenazante. No obstante, este Foro no es el lugar para ese debate. En cuanto al llamado “anti-inteleetualismo” al que alude el Juez, sólo basta con señalar que se es “anti-intelectual” cuando se asumen posiciones que niegan la posibilidad del pensamiento crítico como un ejercicio válido de la razón y el quehacer jurídico.

 La Opinión del Tribunal señala que los requisitos sustantivos de la adopción son jurisdiccionales y que, por lo tanto, el incumplimiento con alguno de ellos priva de autoridad al tribunal para atender la solicitud. La mayoría basa su afirmación en un pronunciamiento de este Tribunal en Ex parte Warren, 92 D.P.R. 299 (1965), y en su progenie.
Comúnmente se sostiene que en Ex parte Warren resolvimos que los requisitos para la adopción contemplados en aquel entonces en el Artículo 130 del Código Civil, 31 L.P.R.A. sec. 531, eran de carácter jurisdiccional. Sin embargo, eso no fue lo resuelto en ese caso. En aquella ocasión, resolvimos que el requisito de residencia del Artículo 130 no equivalía a domicilio, sino a la sola presencia física del adoptante en Puerto Rico. Además, sostuvimos que la finalidad de ese requisito de residencia no era otra que facilitar las investigaciones hechas por la agencia encargada de expre-sarse sobre la conveniencia de la adopción.
Posteriormente, en menor v. J.L.E.M., menor, 124 D.P.R. 910 (1989), citando a Ex parte Warren, sostuvimos que los requisitos sustantivos para adoptar son jurisdiccionales. Íd., pág. 921. Sin embargo, esa conclusión fue errada, pues se basó en la única expresión en Ex parte Warren sobre el carácter jurisdiccional de los requisitos sustantivos, que fue la siguiente:
“Recayó resolución denegando la autorización solicitada en la cual el tribunal de instancia expresa que aunque se ha cumplido con los demás requisitos que exige la ley y es favorable el informe rendido por la agencia de Bienestar Público, el peticio-nario no cumple con la exigencia de residencia del Art. 130 del Código Civil, 31 L.P.R.A. sec. 531, “cuyo requisito es jurisdiccional”. (Énfasis nuestro y en el original). Ex parte Warren, supra, pág. 300.
Por lo anterior, es importante destacar que lo que resolvimos en ese caso no fue la calidad jurisdiccional de los requisitos, sino que interpretamos sólo el requisito de residencia.
Basado en lo que supuestamente se resolvió en Ex parte Warren, en Virella v. Proc. Esp. Rel. Fam., 154 D.P.R. 742, 756 (2001), en Pérez, Román v. Proc. Esp. Rel. de Fam., 148 D.P.R. 201 (1999), y en M.J.C.A., menor v. J.L.E.M., menor, supra, la mayoría del Tribunal sostiene que los requisitos sustantivos son de carácter jurisdic-cional, por lo que su incumplimiento priva de jurisdicción al tribunal. Sin embargo, el Tribunal no enfatiza el hecho de que lo que sí ha prevalecido generalmente en nuestra jurisdicción es la filosofía de que a la hora de conceder • — o no— una adop-ción, lo que debe guiar la decisión de un tribunal es el mejor interés y bienestar de la persona adoptada.

 Resumen ejecutivo de la Comisión de Derechos Civiles de Puerto Rico, dis-ponible en http://www2.pr.gov/agencias/cdc/Publicaciones/InformesEspeciales/ Documents/Resumen%20Ejecutivo%20Proyecto%20Homofobia/proyectohomofobia .pdf (última visita 3 de noviembre de 2012).

 Por ejemplo, en la página 3 del Alegato de la Alianza de Juristas Cristianos se dice que “[l]a relación de dos amigas, un par de mujeres de conducta homosexual y que la peticionaria llama compañeras sentimentales, no constituye una familia”. Igualmente, “[e]l hecho de que una parte significativa de la sociedad considere algu-nas formas de orientación sexual [como] inmorales no es evidencia de discrimen”. Alegato de la Coalición Ciudadana en Defensa de la Familia, pág. 5.

 Tiene razón la mayoría en este caso en cuanto a que Lawrence v. Texas, 539 U.S. 558 (2003), resolvió que no se puede criminalizar la conducta homosexual. Sin embargo, yerra en cuanto a que los pronunciamientos hechos en ese caso no puedan extenderse a la controversia ante nuestra consideración. Esto es así porque, de ma-nera descontextualizada, la Opinión mayoritaria cita una expresión en Lawrence *1064 donde se sostiene que “[t]he present case does not involve minors”. Opinión del Tribunal, acápite VLB, pág. 881. Es importante considerar que con esa expresión, el Tribunal federal hacía referencia a que lo allí resuelto no se extendía a relaciones consensúales donde hubiese menores involucrados, pues en Lawrence, ambos inte-grantes eran mayores de edad. Lo anterior es indispensable a la hora de determinar si un sujeto tiene capacidad para consentir una relación sexual. Sin duda, los meno-res no la tienen.

 Alegato de la Procuradora General, pág. 26.

 Válidamente, ésta puede ser la visión que tengan los miembros de la mayo-ría sobre cómo se constituye una familia ideal. Ello, como reflejo de sus creencias morales y religiosas. El problema estriba cuando la mayoría utiliza el Derecho para imponer ese código moral a la sociedad. Como dijo el Tribunal Supremo en Lawrence v. Texas, supra, pág. 571, “ ‘[o]ur obligation is to define the liberty of all, not to mandate our own moral code’ ”.

 A la premisa de que el mejor interés y bienestar de los menores se encuentra en la familia heterosexual, le subyace, y la Opinión del Tribunal así lo reconoce, la creencia de que “los niños son más beneficiados teniendo... figuras de ambos sexos, preferiblemente un padre y una madre”. Alegato de la Coalición Ciudadana en De-fensa de la Familia, pág. 8. Sin embargo, el Capítulo de Puerto Rico de la Asociación Americana de Pediatría ha expresado: “[1] os niños y niñas que nacen o son adoptados por un miembro de una pareja donde ambos son del mismo sexo, merecen la seguri-dad de tener dos padres (madres) legalmente reconocidos”. Solicitud de Comparecen-cia como Amicus Curiae del Capítulo de Puerto Rico de la Academia Americana de Pediatría, pág. 2.
Por otro lado, la Academia Americana de Pediatría expresa lo siguiente: “[A] growing body of scientific literature demonstrates that children who grow up with 1 or 2 gay and /or lesbian parents fare as well in emotional, cognitive, social and sexual functioning as do children whose parents are heterosexual. Children’s optimal development seems to be influenced more by the nature of the relationships and interactions within the family unit than by the particular structural form it takes”. (Énfasis nuestro). 109 (Núm. 2) Pediatrics 341 (2002).

 En United States v. Virginia, 518 U.S. 515 (1996), el Tribunal Supremo federal se enfrenta a una controversia de discrimen por razón de género en la que aplica los principios de un escrutinio intermedio. En cuanto a los elementos que definen este tipo de examen, menciona:
“[T]he reviewing court must determine whether the proffered justification is ‘exceedingly persuasive.’ The burden of justification is demanding and it rests entirely on the State... The State must show “at least that the [challenged] classification serves ‘important governmental objectives and that the discriminatory means employed’ are ‘substantially related to the achievement of those objectives’”... The justification must be genuine, not hypothesized or invented post hoc in response to litigation. And it must not rely on overbroad generalizations...”. (Énfasis nuestro), íd., pág. 533.
Aunque United States v. Virginia versa sobre controversias de discrimen por razón de género, lo antes citado aplica perfectamente a la controversia de autos por ser ésta una situación en la que están involucrados intereses individuales importan-tes que merecen igualmente una protección constitucional más rigurosa mediante la aplicación de un escrutinio intermedio.

 Aun asumiendo que el interés del Estado es proteger el concepto de familia tradicional —padre, madre e hijos — , tal interés no guarda una relación sustancial con el discrimen estatuido en el Art. 138 del Código Civil. Ante el balance de intere-ses entre el del Estado y los intereses individuales importantes de los ciudadanos, la contención del Estado no justifica mantener vigente e institucionalizar por conducto judicial un discrimen basado en estereotipos históricos que no guardan relación con el desai’rollo de una sociedad plural.
Incluso, de adoptar la teoría de la Opinión del Tribunal, a los efectos de utilizar en controversias como la de autos el escrutinio tradicional, la justificación de preser-var el entendimiento tradicional de la institución de la familia no constituye por sí sola un interés legítimo del Estado porque denota un mero deseo de afectar a grupos políticamente marginados, no siendo esto un interés gubernamental legítimo. Véase Romer v. Evans, 517 U.S. 620 (1996).

 Manuel Fraijó, “Elogio de una renuncia”, El País, http://elpais.com/elpais/ 2013/02/ll/opinion/1360611396 — 869602.html (12 defebrero de 2013).